**STRASSER & ASSOCIATES, P.C.**
7 EAST RIDGEWOOD AVE.
PARAMUS, NEW JERSEY 07652
Phone: (201) 445-9001
Fax: (201) 445-1188
E-MAIL: wis@strasserlaw.com
**Attorneys for Plaintiff, VNB Realty, Inc.**

| | |
|---|---|
| VNB REALTY, INC., a wholly owned subsidiary of Valley National Bank,<br><br>        Plaintiff,<br><br>    v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>        Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION, BERGEN COUNTY<br><br>DOCKET NO.: C- 165 - 13<br><br>**COMPLAINT** |

        Plaintiff VNB Realty, Inc. ("VNB Realty"), by and through its counsel Strasser & Associates, P.C., with offices located at 7 East Ridgewood Avenue, Borough of Paramus, County of Bergen, State of New Jersey, by way of Complaint against the Defendant U.S. Bank National Association ("U.S. Bank") alleges the following:

### I. SUMMARY OF THIS ACTION

        1.    This action arises out of Plaintiff's ownership of beneficial interests ("Certificates") in trusts holding residential mortgage backed securities ("RMBS") for the benefit of investors such as Plaintiff.  The two trusts that are the subject of this lawsuit are CSMC Mortgage-Backed Trust 2006-8, CSMC Mortgage-Backed Pass-Through Certificates, Series 2006 ("CSMC 2006-8") and MASTR Alternative Loan Trust 2007-1, Mortgage Pass-Through

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

Certificates, Series 2007-1 ("MALT 2007-1") (collectively, the "Trusts"). Defendant U.S. Bank is the Trustee and Wells Fargo Bank, N.A., ("Wells Fargo") is the Master Servicer for both Trusts.

2.      Plaintiff has experienced a drastic decline in the value of its investment in the Trusts at the same time that it has witnessed illegal and chaotic treatment of borrowers whose mortgage loans back Plaintiff's investments and further has witnessed the abuse of local, state, and federal processes such as the county recorders' offices and the courts of law related to those loans.

3.      Defendant is aware of likely breaches of representations and warranties contained in Trust documents and of likely improper servicing of loans. Defendant, as Trustee, was in a position to stop and/or correct for the deficiencies, but did not do so because Defendant has a conflict of interest: Defendant has engaged in the same or similar violations of law.

4.      Defendant's inaction has caused significant damage to borrowers and the government and also damaged Plaintiff through dramatically increased costs, reduced borrower payments, increased losses on distressed properties, and the loss of recoveries from repurchases.

5.      Plaintiff seeks monetary and injunctive relief.

## II. PARTIES

6.      Plaintiff VNB Realty is a Real Estate Investment Trust incorporated under New Jersey law with its headquarters and principal place of business in Wayne, New Jersey. VNB Realty is a wholly-owned subsidiary of Valley National Bank. Valley National Bank's main office is in New Jersey and it operates branches throughout northern and central New Jersey. Valley National Bank has been serving customers in New Jersey for 85 years.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

-2-

7.     Defendant U.S. Bank is a national bank that purports to be the fifth largest commercial bank in the United States with its main office located in Cincinnati, Ohio, and its principal place of business located in Minnesota.  U.S. Bank is the Trustee for both Trusts that are the subject of this lawsuit.

### III. JURISDICTION AND VENUE

8.     Jurisdiction and venue are proper in this Court, because Defendant transacts business in Bergen County, New Jersey, the acts and practices giving rise to Plaintiff's claims arose in Bergen County, New Jersey, and because the Defendant is subject to this Court's personal jurisdiction.  Further, the Plaintiff seeks equitable relief in the form of an injunction, thus Plaintiff has properly filed this action in the Superior Court of New Jersey, Bergen County, Chancery Division.

### IV. THE TRUSTS

9.     Plaintiff holds beneficial interests, called "Certificates," in two securitization Trusts: CSMC 2006-8 and MALT 2007-1.  The corpuses of the Trusts consist primarily of residential mortgage loans.

10.    According to the CSMC 2006-8 Prospectus Supplement, CSMC 2006-8 consisted of two pools of 1,468 first-priority, fixed-rate mortgage loans for one-to-four family residential properties with an aggregate principal balance of approximately $554,422,120.[1]

11.    According to the MALT 2007-1 Prospectus Supplement, MALT 2007-1 consisted of approximately 656 fixed-rate, closed-end loans with an original balance of approximately $280,614,198 secured by first priority mortgages, again on one-to-four family residential

STRASSER &
ASSOCIATES
ᴬ PROFESSIONAL CORPORATION

---

[1] Prospectus Supplement (to Prospectus dated August 28, 2006) ("CSMC 2006-8 ProSupp"), at S-5.

properties. The MALT 2007-1 mortgage loans were divided into three segregated collateral groups, with groups 1 and 2 consisting of 30-year loans and group 3 consisting of 15-year loans.[2]

12.     The securitization process begins when a "Borrower" obtains a mortgage loan from a lender, called an "Originator." For CSMC 2006-8, the primary loan Originators were DLJ Mortgage Capital, Countrywide Home Loans, Inc., and Banco Popular De Puerto Rico. For MALT 2007-1, loan Originators included Countrywide Home Loans, Inc. (26.89% of loan balance), Wells Fargo (25.31% of loan balance), and Wachovia Mortgage Company (30.32% of loan balance).

13.     The Originator then sells groups of mortgage loans that it originated to a "Seller" "Transferor" and/or "Sponsor" which holds the loans and collects payments from the Borrower for a period of time. For CSMC 2006-8, the Seller/Sponsor was DLJ Mortgage Capital. For MALT 2007-1, the Transferor/Sponsor was UBS Real Estate Securities Inc.

14.     Once the Seller obtains a sufficient number of loans, the Seller sells those loans to a "Depositor," which typically holds the loans for a very brief period of time before depositing them into a Trust. For CSMC 2006-8, the Depositor was Credit Suisse First Boston Mortgage Securities Corp. For MALT 2007-1, the Depositor was Mortgage Asset Securitization Transactions, Inc.

15.     The establishment and administration of each Trust is governed by a "Pooling and Servicing Agreement" ("PSA").

16.     Once the loans are deposited into a Trust, Borrowers begin making payments to the Trust through a "Master Servicer." The Master Servicer is ultimately responsible for

STRASSER &
ASSOCIATES
A PROFESSIONAL CORPORATION

---

[2] *See* Prospectus Supplement dated January 29, 2007 (To Prospectus dated October 17, 2006) ("MALT 2007-1 ProSupp"), at S-35.

servicing the loans, but may use a designee, typically called a "Servicer" or "Sub-servicer," to perform some or all of the mortgage servicing functions.

17.   For CSMC 2006-8, the primary Master Servicer for Trust loans is Wells Fargo, while Washington Mutual Mortgage Securities Corp. (now a wholly-owned subsidiary of JPMorgan Chase Bank) is Master Servicer for a small number of loans.   Servicers servicing more than ten percent (10%) of the CSMC 2006-8 loans initially included Wells Fargo, Countrywide Home Loans, Inc. (now a wholly-owned subsidiary of Bank of America), and Banco Popular De Puerto Rico.

18.   For MALT 2007-1, the Master Servicer for Trust loans is Wells Fargo.   Servicers servicing more than ten percent (10%) of the CSMC 2006-8 loans initially included Countrywide Home Loans Servicing LP (now part of Bank of America), Wells Fargo, and Wachovia Mortgage Company (now part of Wells Fargo).

19.   When the Master Servicer collects loan payments from Borrowers, the Master Servicer transfers those payments, less allowable deductions, to the "Trustee."   For both CSMC 2006-8 and MALT 2007-1, the Trustee is Defendant U.S. Bank.   The Trustee then distributes the payments to the Trust's beneficiaries, called "Certificateholders," such as Plaintiff VNB Realty.   The Certificateholders thereby participate in the cash flow collected from Borrowers by the Master Servicer for the mortgage loans held by the Trust.

20.   Each Trust thus is administered primarily by two entities – the Trustee, which is the "face" of each Trust to Trust beneficiaries such as Plaintiff, and the Master Servicer, which is the "face" of each Trust to Borrowers.   The entire process is graphically illustrated below:

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

## Securitization



21.    Because the Trustee holds the Trust corpus for the benefit of Certificateholders, the Master Servicer acts in the name of the Trustee when taking action against Borrowers. The Master Servicer, for instance, acts in the name of a Trustee when bringing property foreclosure actions against delinquent Borrowers.

### V. PLAINTIFF'S ACQUISITIONS, LOSSES, AND NOTICE(S) TO TRUSTEE

22.    On October 20, 2006, Plaintiff purchased Class 5A1 Certificates in CSMC 2006-8, CUSIP No. 22942MBF2.  Plaintiff's certificates in CSMC 2006-8 had a par value of $21,637,000 when purchased.

23.    Since the date of purchase, Plaintiff has taken impairment charges on its Certificates in CSMC 2006-8 in the amount of $1,024,253.00.

24.    All of the other Certificateholders in CSMC 2006-8 Class 5A1 have been similarly harmed, as have the Certificateholders in the entire trust.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

25.    At the time of issuance, Standard & Poor's gave Plaintiff's CSMC 2006-8 Certificates a "AAA" rating.  Standard & Poor's most recent rating for Plaintiff's Certificates was "D," or junk bond status.

26.    At the time of issuance, Fitch Ratings gave Plaintiff's CSMC 2006-8 Certificates a "AAA" rating.  Fitch's most recent rating for Plaintiff's Certificates was "D," or junk bond status.

27.    On January 30, 2007, Plaintiff purchased Class 2A7 Certificates in MALT 2007-1, CUSIP No. 55275SANO.  On January 31, 2007, Plaintiff purchased Class 2A1 Certificates in Malt 2007-1, CUSIP No. 55275SAG5.  Plaintiff's Certificates in MALT 2007-1 had a par value of approximately $30 million when purchased.

28.    Since the date of purchase, Plaintiff has taken impairment charges on its Certificates in MALT 2007-1 in the amount of $2,555,088.00.

29.    All of the other Certificateholders in MALT 2007-1, Class 2A1 have been similarly harmed, as have the Certificateholders in the entire trust.

30.    At the time of issuance, Standard & Poor's gave Plaintiff's MALT 2007-1 Certificates a "AAA" rating.  Standard & Poor's current rating for Plaintiff's Certificates is "cc," or junk bond status.

31.    At the time of issuance, Moody's gave Plaintiff's MALT 2007-1 Certificates a "Aaa" rating.  Fitch Ratings' current rating for Plaintiff's Certificates is "Caa3," or junk-bond status.

32.    Defendant has notice of substantial evidence of breaches of representations and warranties in the underlying documents for both Trusts.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

- 7 -

33.     The Trustee has thus not acted to protect the Certificateholders such as Plaintiff from the damages resulting from the improper servicing of loans held by the Trust and, in the case of MALT 2007-1, has improperly denied the Plaintiff access to loan files.

## VI. TRUSTEE'S DUTIES

34.     Defendant U.S. Bank, as Trustee for CSMC 2006-8 and MALT 2007-1, has a duty, pursuant to the applicable PSAs, to acquire and protect the Trust corpus for the benefit of Certificateholders.  In the context of residential mortgage-backed securities, mortgage loans and associated rights to enforce payment obligations make up the Trust corpus.

35.     As with most trusts, The PSAs for CSMC 2006-8 and CSMC 2007-1 provide that the first step in the mortgage conveyance process is the Depositor's conveyance or sale of the mortgage loans to the Trustee for the benefit of the Certificateholders.[3]

36.     Section 2.01 of the CSMC 2006-8 and MALT 2007-1 PSAs then provide that the Trustee or its agent takes possession of documents evidencing ownership, including the original Mortgage Note, the recorded Mortgage, and Assignments, "for the benefit of the Certificate holders."  A slightly different conveyance process is outlined for loans handled through the MERS System, but the ultimate goal is the same: to ensure "a complete chain of endorsement

---

[3] CSMC 2006-8 PSA § 2.01(a) provides:

> The Depositor hereby sells, transfers, assigns, delivers, sets over, and other conveys to the Trustee in trust for the benefit of the Certificateholders, without recourse, the Depositor's right, title and interest in and to (a) the Mortgage Loans listed in the Mortgage Loan Schedule, including all interest and principal received or receivable by the Depositor on or with respect to the Mortgage Loans after the Cut-off Date and any Assigned Prepayment Premiums, but not including payments of principal and interest due and payable on the Mortgage Loans on or before the Cut-off Date, together with the Mortgage Files relating to the Mortgage Loans, (b) REO Property related to the Mortgage Loans, (c) the Collection Account and the Certificate Account and all amounts deposited therein pursuant to the applicable provisions of this Agreement, (d) any insurance policies with respect to the Mortgage Loans, (e) the Depositor's rights under the Assignment and Assumption Agreement and (f) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property." See also CSMC 2006-8 PSA § 2.01(d); 2007-1 PSA § 2.01(a).

STRASSER & ASSOCIATES
A PROFESSIONAL CORPORATION

from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing ...."[4]

37.   The Trustee then accepts the documents as evidence of ownership of the mortgage loans and holds them "for the exclusive use and benefit of all present and future Certificateholders."[5]

38.   As part of the process of ensuring that perfected and enforceable title has been transferred to the Trusts, the CSMC 2006-8 and MALT 2007-1 PSAs also provide for completion of a Final Certification by the Custodian.[6]

---

[4] MALT 2007-1 PSA § 2.01(b)(i).

[5] According to CSMC 2006-8 PSA § 2.02(a):

> [T]he Trustee acknowledges receipt of the documents referred to in Section 2.01 above and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of the Trust Fund in trust for the exclusive use and benefit of all present and future Certificateholders.

According to MALT 2007-1 PSA § 2.02(a):

> The Custodian, on behalf of the Trustee, acknowledges receipt of the documents identified in the Initial Certification issued by it in the form annexed hereto as Exhibit G [Initial Certification] and declares that it holds and will hold such related documents and the other documents delivered to it constituting the Mortgage Files, and the Custodian and Trustee together declare that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders.

[6] CSMC 2006-8 § 2.02 provides in pertinent part:

> Not later than 90 days after the Closing Date, the Custodian shall deliver to the Depositor, the Trustee and the Transferor a Final Certification in the form annexed hereto as Exhibit H, with any applicable exceptions noted thereon.... Upon receiving each Final Certification from the Custodian, the Transferor shall determine if there are any document defects listed as exceptions in such Final Certification. In the event any such document defects exist, the Transferor shall promptly correct or cure such document defects, and if the Transferor fails to correct or cure the defect within ninety (90) days of the earlier of its discovery or its receipt of written notice from the Trustee, and such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Transferor shall repurchase the affected Mortgage Loan from the Trustee at the Purchase Price.

MALT 2007-1 § 2.02 provides in pertinent part:

> The Trustee shall, or pursuant to the Custodial Agreements, the Trustee shall require the Custodians to, not later than 90 days after the Closing Date, deliver to the Depositor, each Servicer, the Trustee and the Trust Administrator a Trust Receipt and Final Certification with respect to the Mortgage Loans, in the form annexed hereto as Exhibit K, with any applicable exceptions noted thereon.... If, in the course of its review, the Custodians find any document constituting a part of a Mortgage File to be missing or incomplete, the Seller shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if the Seller does not correct or cure such defect within such period and such defect materially and adversely affects the interests of Certificateholders in the related Mortgage Loan, the Seller shall either (a) substitute for the related Mortgage Loan a Qualified Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) repurchase such Mortgage Loan within 90 days from the date the Seller was notified of such defect in writing at the Purchase

STRASSER & ASSOCIATES
PROFESSIONAL CORPORATION

39.     Section 2.04 of the CSMC 2006-8 and MALT 2007-1 PSAs provide that the Depositor's representations and warranties concerning the transfer of good title to the Trusts extend beyond delivery of the Mortgage Files.  They also promise that the representations and warranties regarding good title survive the transfer and that if "upon discovery by the Depositor, the Transferor, the Master Servicer, the Trust Administrator or the Trustee of a breach of any of the foregoing representations and warranties set forth in this Section 2.04," and "which breach materially and adversely affects the interest of the Certificateholders, the party discovering such breach shall give prompt written notice to the other parties hereto and to each Rating Agency."

40.     A Trustee's failure to acquire perfected and enforceable title to mortgage loans materially and adversely affects the interests of Certificateholders like Plaintiff because it creates a situation in which the Trustee or its agent will not be able enforce mortgage obligations or initiate foreclosures, if such actions become necessary.

41.     Defendant U.S. Bank, as Trustee for CSMC 2006-8 and MALT 2007-1, also has a duty to enforce the Seller's and/or Servicer's obligations to cure, substitute, or repurchase mortgage loans that breach applicable representations and warranties.

42.     The Sellers or Transferors of the mortgage loans included in CSMC 2006-8 and MALT 2007-1 made a series of representations and warranties concerning characteristics of the borrower, collateral for the Mortgage Loans, and compliance with underwriting guidelines.

43.     CSMC 2006-8 PSA Schedules IIA and IIIA contain representations of the Seller. Among other things, the Seller represents or warrants that no mortgage loan is "30 days or more delinquent in payment" and that "there are no material defaults under the terms of the Mortgage Loan" (iii); "[e]ach Mortgage Loan that is secured by residential real property (or a leasehold

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

Price of such Mortgage Loan; or such longer period not to exceed 720 days from the Closing Date if the substitution or repurchase of a Mortgage Loan pursuant to this provision is required by reason of a delay in delivery of any documents by the appropriate recording office;...

interest therein) has a loan-to-value ratio of 100% or less by Cut-Off Date Principal Balance" (xxviii); "[e]ach Mortgage Loan at the time it was made complied in all material respects with applicable federal, state or local law" (viii); "[t]he Mortgage Loan complies with all the terms, conditions and requirements of the originator's underwriting standards in effect, at the time of origination" (xviii); and "[e]ach Mortgage Loan has been serviced in all material respects in compliance with accepted servicing practices" (xvi). MALT 2007-1 PSA makes nearly identical representations and warranties.[7]

44.      Breaches of many of a Seller's or Transferor's representations or warranties materially and adversely affect the interests of Certificateholders like Plaintiff because they make it far more likely that the Borrower will be unable to meet his or her obligation to pay back the Mortgage Loan. A Lender that does not verify the Borrower's income consistent with applicable underwriting guidelines, for instance, is far more likely to have a Borrower who cannot meet repayment obligations than a Lender who does resulting in a material and adverse effect under the applicable agreements.

45.      Section 2.03 of the CSMC 2006-8 and MALT 2007-1 PSAs provide that any party who discovers a material breach of representation or warranty by a Seller shall give prompt notice to the other parties and that the Seller must cure the breach, substitute a qualified mortgage loan, or repurchase the loan to remedy the breach.

---

[7] MALT 2007-1 PSA PSA § 2.03, Schedule II, provides:

> (xi) All payments required to be made up to but not including the Due Date immediately preceding the Cut-off Date . . . have been made and no payment under any Mortgage Loan has been 30 days delinquent more than one time within twelve months prior to the Closing . . . (xxii) Each Mortgaged Property consists of a one to four unit residential property, . . . (xxviii) The Mortgage Loan was underwritten in accordance with the underwriting guidelines of the related Loan Seller in effect at the time of origination with exceptions thereto exercised in a reasonable manner; . . . (xxxi) As of the Cut-off Date, the range of original Loan-to-Value Ratios of the Mortgage Loans is 16.44% to 95.00% and 9 Mortgage Loans, representing 4.77% of the Cut-off Date Pool Balance, had Loan-to-Value Ratios at origination in excess of 80%. . . . (xxxv) With respect to each Mortgage Loan, either (a) an appraisal acceptable to FNMA or FHLMC has been obtained or (b) an appraisal on Form 1004 or Form 2055 with an interior inspection has been obtained. . . .

46.     In addition the seller's and transferor's representations, the Master Servicers and Subservicers of the mortgage loans included in CSMC 2006-8 and MALT 2007-1 made a series of covenants, representations, warranties, and commitments concerning servicing, including that "Servicer shall act in a manner consistent with this Agreement and with customary and usual standards of practice of prudent mortgage loan master servicers."[8]

47.     When the Master Servicer fails to perform various duties under the CSMC 2006-8 and MALT 2007-1 PSAs, it triggers an Event of Default or Termination.   Once an Event of Default or Termination occurs, the Trustee has a heightened duty under the terms of the PSA.[9] When a default occurs, the Trustee has a heightened duty under the Trust Indenture Act.

---

[8] CSMC 2006-8 PSA Schedules IIA, IIB, IIC, IIB, IIF, and IIG contain representations and warranties of the Master Servicer and various Subservicers. *See* PSA § 2.03(a). CSMC 2006-8 PSA § 3.01 further provides in pertinent part:

> For and on behalf of the Certificateholders, as independent contractors of the Trustee, (i) each Servicer, severally and not jointly, shall service and administer the related Non-Designated Mortgage Loans in accordance with the terms of this Agreement and with Accepted Servicing Practices and with all applicable requirements of the Servicing Criteria, (ii) the Master Servicer shall, in accordance with Section 3.03 of this Agreement, master service and administer the Non-Designated Mortgage Loans (other than the WMMSC Serviced Mortgage Loans) by overseeing and enforcing the servicing of the Non-Designated Mortgage Loans by the related Servicer (other than WMMSC) according to the terms of this Agreement and (iii) the Master Servicer shall, in accordance with the Section 3.20 of this Agreement, master service and administer the Designated Mortgage Loans by overseeing and enforcing the servicing of the Designated Mortgage Loans by the related Designated Servicer according to the terms of the related Designated Servicing Agreement.

CSMC 2006-8 PSA § 3.03 goes on to provide in pertinent part:

> For and on behalf of the Certificateholders, the Master Servicer shall oversee and enforce the obligation of [the Servicers] to service and administer the [Mortgage Loans] in accordance with the terms of this Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with this Agreement and with customary and usual standards of practice of prudent mortgage loan master servicers.

MALT 2007-1 PSA § 3.01 provides in pertinent part concerning servicing:

> For and on behalf of the Certificateholders, the Master Servicer shall supervise, monitor and oversee the obligation of the Servicers to service and administer their respective Mortgage Loans in accordance with the terms of the applicable Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with this Agreement, subject to the prior two sentences, and with customary and usual standards of practice of prudent mortgage loan master servicers.

[9] CSMC 2006-8 PSA § 9.01 provides in pertinent part:

> The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes with respect to the Trust Fund to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default of which a Responsible Officer of the Trustee shall have actual knowledge has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and

STRASSER &
ASSOCIATES
\ PROFESSIONAL CORPORATION

- 12 -

48.    The Trustee cannot escape its obligations under federal and state law or the applicable PSAs by failing to take action to acquire more information or nose to the source when public and private investigations and reports produce evidence of systemic misconduct.

## VII. TRUSTEE'S FAILURES

49.    Countless court cases, governmental and regulatory investigations, academic studies, and media reports document the widespread malfeasance engaged in by some of the nation's largest financial institutions in order to protect their profits at the expense of borrowers and Certificateholders.  As Housing and Urban Development Secretary Shaun Donovan recently reacted to the "appalling way banks have treated families throughout this crisis," and observed that "allowing some of our largest and most powerful institutions to play by a different set of rules than everybody else – to commit forgery and perjury against ordinary families is not only appalling, it's also illegal.[10]

50.    In a 2003 Moody's article on structured finance, entitled "Moody's Re-examines Trustees' Role in ABS and RMBS," the author concluded that the trustees must bear some of the blame for how the banks treated these families, and the investors who purchased securities backed by their loans.  The author wrote that the "trustees' performance has fallen short of

---

skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs....

MALT 2007-1 PSA § 8.01 provides in pertinent part:

The Trustee, prior to the occurrence of a Master Servicer Event of Termination and after the curing or waiver of all Master Servicer Events of Termination that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement. In case a Master Servicer Event of Termination has occurred and remains uncured or unwaived, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs, but only until such time as a successor Master Servicer shall have been appointed hereunder.

[10] Shaun Donovan, Secretary, U.S. Dep't of Hous. & Urban Dev., Remarks at the 14th Annual National Action Network (Apr. 13, 2012) (transcript available at http://tinyurl.com/cvdmf4).

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

expectations," and that their review showed that the trustees were weak when it came to "taking action when evidence of impropriety is presented" and "taking note of covenant breaches."[11]

51.     As to many trustees' argument that they provide only "limited to strictly administrative functions as detailed in the transaction documents" and have no "fiduciary" duty prior to an event of default, Moody's disagreed and noted that the "trustee's role was [often] considered a significant investor safeguard at the time the deal was rated."

52.     Moody's also concluded that the trustee should oversee the servicer and implement safeguards if the servicer appears to be charging too much or defrauding the investors or mishandling funds.  "In transactions involving weaker seller/servicers, the trustee's role is much more important to the rating analysis."  In other words, Moody's concluded that the trustees had duties to prevent much of the malfeasance that harmed families, investors, and the economy.

**A.     Trustee's Failure to Address Origination-Related Breaches of Representation and Warranties**

53.     For CSMC 2006-8, one of the primary loan Originators was Countrywide Home Loans, Inc. 2006-8 ProSupp, at S-31.  During the time period when the loans for CSMC 2006-8 were originated, Countrywide originated loans recklessly, negligently and well below the standards required of it.

54.     For MALT 2007-1, the loan Originators included Countrywide Home Loans, Inc. and Wells Fargo.  MALT 2007-1 ProSupp, at S-37 to S-41, S-55.  During the time period when the loans for CSMC 2006-8 were originated, Wells Fargo and Countrywide originated loans recklessly, negligently and well below the standards required of them.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

---

[11] Claire M. Robinson, Moody's Re-examines Trustees' Role in ABS and RMBS, Moody's Investors Service (February 2003).

- 14 -

55.     According to a complaint filed by the Federal Trade Commission on June 7, 2010, *Federal Trade Commission v. Countrywide Homes Loans, Inc. and BAC Home Loans Servicing, LP*, No. CV-10-4193 (C.D. Cal.), Countrywide Home Loans, Inc. knowingly originated risky loans. The FTC asserted that, as with the loans in the Trusts here, "[m]any of the loans [at issue in that lawsuit] . . . are risky, high-cost loans that had been originated or funded by Defendants' parent company, Countrywide Financial Corporation ("CFC") and its subsidiaries." Despite pervasive evidence of breaches of the representations and warranties relating to the origination of the loans in the Trusts, U.S. Bank failed to nose to the source, provide notice of, and address these breaches.

56.     Indeed, Allstate Insurance Company commissioned a review of the mortgage loans in the CSMC 2006-8 Trust.  The Allstate review uncovered significant and material discrepancies between statements contained in the Prospectus Supplement and actual loan data.

57.     The CSMC 2006-8 ProSupp stated that 77.9% of borrowers occupied the mortgaged property [CSMC 2006-8 ProSupp at II-1 to II-21] when the actual percentage of owner-occupied properties was 65.0%, an overstatement of 12.85%.

58.     The CSMC 2006-8 ProSupp stated that only 0.75% of loans had loan-to-value ratios of 80% or more [CSMC 2006-8 ProSupp at II-1 to II-21] when the actual percentage was 37.73%, an understatement of 36.98%.

59.     The CSMC 2006-8 ProSupp stated that only 0.27% of loans had loan-to-value ratios of 90% or more [CSMC 2006-8 ProSupp at II-1 to II-21] when the actual percentage 15.98%, an understatement of 15.71%.

60.     The Allstate review also found that merely 54% of the loans reviewed, which included loans in the CSMC 2006-8, complied with applicable underwriting standards.

61.     Defendant U.S. Bank knew or should have known of Allstate's findings and took no action to further investigate or give notice of the breaches on behalf of Certificateholders in the Trust.[12]

62.     Borrowers who live in their own homes are less likely to default on their mortgage obligations than investment property borrowers. Thus, when securitized pools of home loans are secured by owner-occupied properties, those pools are less risky for investors than those secured by higher numbers of investment property loans.

63.     Likewise, borrowers who still have substantial equity in their homes and loan to value ratios substantially below 100% are less likely to default on their mortgage loan obligations, and, in turn, less likely to harm Certificateholders who have invested in a trust containing that borrower's loan.

64.     Thus, both owner-occupancy statistics and loan-to-value ratios are very important statistics for a prospective investor in an RMBS Trust. Had VNB Realty known that Defendants' statements regarding the LTV and owner occupancy statistics in the ProSupps were false or misleading, then it would not have invested in the Trusts.

65.     Moreover, VNB Realty has been harmed by Defendant's failure to take the actions it was required to take when it became aware of the seller's, originator's, servicer's and Master Servicer's malfeasance and representation and warranty breaches.

**B.    Trustees' Failure to Ensure Proper Execution of Loan Documents and to Address Servicing-Related Breaches of Representations and Warranties**

66.     In breach of its duties, Defendant U.S. Bank failed to insure that the mortgage documents were properly executed. Defendant further failed to investigate and address problems with the servicing of the documents even after the pervasiveness of servicing-related problems

STRASSER &
ASSOCIATES
. PROFESSIONAL CORPORATION

---

[12] Having been improperly denied access to the loan files for MALT 2007-1, Plaintiff is unable to determine origination-related breaches for that trust.

became nationally known.   Upon information and belief, U.S. Bank sanctioned and even participated in the execution and servicing violations, as set forth below.

67.   Legal commentators have written about the mortgage securitization industry's failure to ensure that mortgage documents were properly executed.   Professor Alan M. White writes: "[E]specially during the subprime lending boom of 2004-2007, notes were neither endorsed nor delivered."[13]   Professor Dale A. Whitman goes further: "While delivery of the note might seem a simple matter of compliance, experience during the past several years has shown that, probably in countless thousands of cases, promissory notes were never delivered to secondary market investors or securitizers, and in many cases, cannot presently be located at all. The issue is extremely widespread, and, in many cases, appears to have been the result of a conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes representing the loans they were selling."[14]   Indeed, as Professor Adam J. Levitin testified before Congress, it was the practice of numerous originators to shred original notes rather than deliver them according to the transaction documents.[15]

68.   The five largest mortgage servicers by volume are Bank of America, Wells Fargo, JPMorgan Chase, Citibank, and Ally Bank/GMAC.   These five servicers account, collectively, for 60 percent of the total servicing volume nationwide.   As noted, Wells Fargo is Master Servicer of the Trusts at issue here, and Wells Fargo and Bank of America are both servicers of loans held by the Trusts.

---

[13] Alan M. White, Losing the Paper -- Mortgage Assignments, Note Transfers and Consumer Protection, 24 LOY. CONSUMER L. REV. 468, 475 (2012).

[14] Dale A. Whitman, How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It, 37 PEPP. L. REV. 737, 757-58 (2010) (internal citation omitted).

[15] Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in Mortgage Servicing; Hearing Before the H. Subcomm. On Hous. and Comty. Opportunity of the H. Fin.Serv. Comm., 111th Cong. 2d Sess. (2010).

STRASSER &
ASSOCIATES
‹ PROFESSIONAL CORPORATION

69.     The national foreclosure crisis revealed the widespread use by mortgage servicers, including Wells Fargo, of "robo-signing," the practice of signing mortgage assignments, satisfactions and other mortgage-related documents in assembly-line fashion, often with a name other than the affiant's own, and swearing to personal knowledge of facts of which the affiant has no knowledge.

70.     In January 2010, Wells Fargo employee Stanley Silva testified that he routinely executed notices of default without verifying the accuracy of the information contained therein. In March 2010 sworn deposition testimony, a Wells Fargo employee named Xee Moua revealed that she signed between 300 and 500 foreclosure documents a day without first reviewing the figures for accuracy and did not view verification of the information contained in affidavits as part of her "job description." Ms. Moua's supervisor, Mr. H. John Kennerty of Wells Fargo Home Mortgage, testified on May 10, 2010, that he signed 50 to 150 documents a day. His review of such documents consisted only of verifying the date. He estimated that in approximately half of the files he examined in his office an original assignment was in the file and not recorded.

71.     From at least 2006 through 2010, LPS, purportedly one of the nation's leading providers of mortgage loan processing, settlement, and default services whose former clients include Wells Fargo, executed various mortgage-related documents on behalf of its mortgage company clients. These documents included mortgage assignments, satisfactions, lien releases, and other documents filed with the Register of Deeds.

72.     LPS employees signed thousands of documents each day. The employees who signed documents were not placed under oath, did not sign in the presence of notaries, and/or did not have personal knowledge of the information to which they attested. LPS subsidiary DocX

implemented a scheme whereby it had employees forge a stable of names on thousands of mortgage documents that DocX then filed with governmental recording offices and other county offices and courts throughout the country.

73.    Upon information and belief based on allegations made in pending litigation, in Guilford County, North Carolina, alone, DocX filed 2,462 robo-signed documents on behalf of Wells Fargo, 999 robo-signed documents on behalf of MERS Inc., 693 robo-signed documents on behalf of Bank of America, and five robo-signed documents on behalf of Defendant U.S. Bank.

74.    Jeff Thigpen, Guilford County Register of Deeds, surveyed documents filed with his office between August 2006 and April 2010.  He identified approximately 6,100 mortgage documents filed by DocX during that time period, 4,519 of which were signed in the name of a known robo-signer.

75.    DocX also falsely notarized its robo-signed mortgage documents.   The notarizations falsely attested that the person whose signature appeared on the document "personally appeared" before the notary when in fact the signature had been forged by someone other than the purported signatory and the person signing had not appeared before a notary.

76.    LPS shut down its DocX operation in 2010, following extensive media attention about its robo-signing of mortgage-related documents.  Based on court filings and various news reports, LPS executed and notarized mortgage documents at locations other than just its DocX subsidiary.

77.    According to the Congressional Oversight Panel's November Oversight Report, "Affidavits such as the ones involved in the foreclosure irregularities are statements made under

STRASSER & ASSOCIATES
PROFESSIONAL CORPORATION

oath and thus clearly fall within the scope of the perjury statutes." Congressional Oversight Panel, November Oversight Report, Nov. 16, 2010, at 42.

78.     In October 2010, following revelations regarding the widespread use of robo-signed affidavits in foreclosure proceedings throughout the United States, state attorneys general formed a coalition to investigate and address the problem. The state attorneys general subsequently partnered with the federal government in investigating and negotiating a settlement with mortgage servicers, including Wells Fargo, the Master Servicer of the Trusts.

79.     The Nevada Attorney General filed a lawsuit against LPS and DocX on December 15, 2011, alleging that their robo-signing and other mortgage and foreclosure related practices violate state unfair and deceptive trade practices statutes and other laws.

80.     The Circuit Court of Boone County, Missouri indicted and charged DocX on February 3, 2011, with criminal forgery and other crimes as a result of its execution of forged mortgage documents. The criminal proceedings have now been settled and dismissed upon material admissions of DocX.

81.     On April 13, 2011, the Federal Reserve Board took action with regarding to robo-signing and other misconduct, announcing "formal enforcement actions requiring 10 banking organizations to address a pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. These deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at these institutions."[16]

82.     Also on April 13, 2011, the Federal Reserve Board signed and published twelve consent orders in which Bank of America, JPMorgan Chase & Co., and Wells Fargo, as well as

---

[16] Press Release, Board of Governors of the Federal Reserve System (Apr. 13, 2011) (available at http://tinyurl.com/3wyhm52).

U.S. Bancorp, a registered bank holding company that owns and controls Defendant U.S Bank, among others, agreed to take corrective action. *Id.* The consent orders stated that "[t]he OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." According to the consent orders, Wells Fargo and Bank of America "filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, . . . based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records," and that they "filed or caused to be filed in state and federal courts or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary."[17]

83.    Upon information and belief, U.S. Bank, and the Master Servicer and Servicers, Wells Fargo and Bank of America, have all used LPS and have filed robo-signed documents in the Trusts herein.  Such fraudulently executed and/or notarized mortgage documents impair the chain of title to the properties to which they pertain and thereby harm property owners including the Trusts, governmental recording offices, and the public.

84.    As additional support for these robo-signing allegations, Credit Suisse unit DLJ Mortgage Capital, the originator for many of the loans in CSMC 2006-2, tried to foreclose on Mary Arthur of Dobbs Ferry, New York after she defaulted on her loan.  DLJ filed what it said were authentic copies of Mrs. Arthur's promissory note in two separate court cases – one in state court one in bankruptcy court.  Because they were supposed to be copies of the same document,

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

---
[17] On April 13, 2011, the OCC also entered into a consent order with U.S. Bank that contained virtually identical findings. *In the Matter of U.S. Bank Nat'l Ass'n*, No. AA-EC-11-18 (April 13, 2012), available at http://tinyurl.com/3jzdn7c.

the endorsements filed with both courts should have been identical.  But the document filed in state court and the one filed in bankruptcy court had completely different endorsements on them – naming different owner banks and signed by different people.

85.    Defendant US Bank, itself, has also engaged in filing flawed and misleading documents relating to foreclosures on mortgages held in investment pools.  In 2011, the Massachusetts Supreme Court held that US Bank, as trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-Z, could not foreclose on a loan, as a trustee for a mortgage-backed securities trust, because the documentation US Bank provided in support of the foreclosure was inadequate, improper and incomplete.[18]

86.    On information and belief, and as a result of US Bank's activities in other matters, U.S. Bank itself or acting through the originators, sellers, servicers and the Master Servicer, filed flawed, misleading and unlawful documents as set forth in the OCC and Federal Reserve Consent Orders with regard to the Trusts.

87.    The Defendant's failure to take corrective action has made it costly, and in some cases nearly impossible, for anyone to effectively and efficiently pursue foreclosures on residential mortgages within the Trusts, causing substantial damages to Plaintiff.  In fact, no foreclosure can take place at the cost anticipated when Plaintiff invested in the Trusts, because the costs associated with preparing foreclosure documentation and participating in the enhanced foreclosure processes have increased exponentially.[19]

---

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

[18] *US Bank Nat'l Assoc. v. Ibanez*, 941 N.E.2d 40 (Mass. 2011).  "The judge did not err in concluding that the securitization documents submitted by [US Bank] failed to demonstrate that [it] was the holder[] of the . . . mortgages, . . . ." *Id.* at 53.

[19] As the Honorable Arthur M. Schack of the New York State Supreme Court explained to Congress, courts are experiencing a "logjam" in foreclosures due to the heightened requirements, because many bank lawyers are reluctant to file the requisite affirmations under the penalty of perjury.  Testimony of Hon. Arthur M. Schack before the Committee on Oversight and Government Reform on March 19, 2012, available at http://oversight.house.gov/wp-content/uploads/2012/03/Schack-Testimony-and-CV.pdf.

88.     Because Defendant U.S. Bank was itself engaged in massive robo-signing with regard to other deals, the Defendant labored under a conflict of interest that made it impossible for the Defendant to prevent, remedy, or address the robo-signing within the Trusts at issue.

89.     As a result, Defendant U.S. Bank has caused substantial damages, and will continue to cause substantial damages to Plaintiff through loss and injury to the Trusts caused by the increased costs of foreclosure and the additional costs and burdens set forth above.

90.     In addition to robo-signing, government investigations and reports have revealed other wide-spread servicing breaches and abuses involving misconduct by the servicers of the Trusts at issue in this action.

91.     Beginning in late 2010, the Office of Comptroller of the Currency ("OCC"), the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the Federal Reserve Board undertook a coordinated horizontal examination of foreclosure processing at the nation's 14 largest mortgage servicers, including Bank of America, Citibank, JPMorgan Chase, and Wells Fargo. According to John Walsh, Acting Comptroller of the Currency, "the examinations found critical deficiencies and shortcomings in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third party law firms and vendors." He concluded that "[t]hese deficiencies have . . . had an adverse effect on the functioning of the mortgage markets and the U.S. economy as a whole.[20]

92.     Losing a home to foreclosure can be one of the most serious, stressful, and devastating events in a person's life. Thus, Borrowers should be treated with respect, and the foreclosure process should be performed in a manner that is honest, legal, and in compliance with due process of law.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

---

[20] Testimony Before the Committee on Banking, Housing and Urban Affairs (Feb. 17, 2011) (statement of John Walsh, Acting Comptroller of the Currency, available at http://tinyurl.com/cbm52sd, at 15).

93.    Borrowers working to save their homes from foreclosure include: (a) good-faith Borrowers experiencing difficult life events; (b) victims of predatory lending activities who were misled or defrauded outright into obtaining loans they could not afford; but also include (c) fraudulent Borrowers who engaged in property-flipping schemes, straw-man purchases, or other fraudulent acts, which often are accompanied by a failure to make any payments to a Trust; and (d) abandonment Borrowers who cannot make meaningful payments under any circumstances and/or have abandoned the property.

94.    Good-faith borrowers should be given a reasonable opportunity to stay in their homes when that result outweighs the net present value of foreclosing. And, the entities that sold Trust loans to predatory lending victims should be forced to repurchase those loans and face the consequences of their wrongful acts vis-à-vis the Borrower under applicable law.

95.    Fraudulent and abandonment borrowers should be foreclosed upon promptly and abandoned properties resold, not only for the benefit of Certificateholders such as Plaintiff, but also to prevent the decay and decimation to neighborhoods that accompany abandoned or vandalized properties.

96.    In addition to the problems related to robo-signing, the aforementioned consent orders published by the Federal Reserve found that, with regard to foreclosure practices, the servicers (i) "litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time," "failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes"; (ii) "failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

management, internal audit, third-party management, and training," and (iii) "failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."[21]

97.     The April 13, 2011, OCC consent order with U.S. Bank contained virtually identical findings.[22]

98.     On March 12, 2012, the United States Department of Housing and Urban Development's Office of the Inspector General ("HUD OIG") issued a series of audit memorandums of review of foreclosure practices of the five largest Federal Housing Administration servicers, including Wells Fargo Bank and Bank of America. The HUD OIG's report covered foreclosure and claims processes between October 1, 2008, and September 30, 2008.[23]

99.     The HUD OIG's report of Wells Fargo's foreclosure practices concluded that "Wells Fargo did not establish effective control over its foreclosure processes. This failure permitted a control environment in which . . . affiants routinely signed and certified that they had personal knowledge of the contents of documents, including affidavits, without the benefit of supporting documentation and without reviewing the source documents referred to in the affidavits and verifying the accuracy of the foreclosure information stated in the affidavits. A number of affidavit signers admitted having signed up to 600 documents per day."[24]

[21] *In the Matter of Wells Fargo Bank, N.A.*, No. AA-EC-11-19 (Apr. 13, 2011), at 2-3, available at http://tinyurl.com/b6o2aso; *In the Matter of Bank of America, N.A.*, No. AA-EC-11-12 (Apr. 13, 2011), at 2-3, available at http://tinyurl.com/cgrsue6.

[22] *In the Matter of U.S. Bank Nat'l Ass'n*, No. AA-EC-11-18 (April 13, 2012), available at http://tinyurl.com/3jzdn7c.

[23] U.S. Dep't of Hous. & Urban Dev't, Office of Inspector General, Memorandum No. 2012-FW-1801: Wells Fargo Bank Foreclosure and Claims Process Review Fort Mill, SC, March 12, 2012, available at http://tinyurl.com/d2k6t2l; U.S. Dep't of Hous. & Urban Dev't, Office of Inspector General, Memorandum No. 2012-FW-1802: Bank of America Corporation Foreclosure and Claims Process Review Charlotte, N.C., March 12, 2012, available at http://tinyurl.com/crgkrk3.

[24] Memorandum No. 2012-FW-1801, at 4.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

100.   Following a 16-month investigation, a coalition of 49 State Attorneys General and the United States Departments of Justice, Treasury, and Housing and Urban Development reached a settlement with the country's five largest mortgage servicers, including Bank of America, Wells Fargo, one of the servicers for the mortgages in the Trusts, and related affiliates, (collectively referred to as "the Banks" in settlement approval litigation) in March 2012.[25]

101.   The Governments' complaint in the settlement proceeding alleges that the Banks engage in "unfair and deceptive practices in the discharge of their loan servicing activities" including but not limited "failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; charging excessive or improper fees for default-related services; failing to properly oversee third-party vendors involved in servicing activities on behalf of the Banks; imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage; providing borrowers false or misleading information in response to borrower complaints; and failing to maintain appropriate staffing, training, and quality control systems."[26]

102.   The Governments' complaint further alleges that mortgage servicers, including Bank of America and Wells Fargo and related affiliates, "fail[ed] to discharge their required loan modification obligations, and related unfair and deceptive practices, includ[ing], but not limited to, failing to perform proper loan modification underwriting; failing to gather or losing loan modification application documentation and other paperwork; failing to provide adequate staffing to implement programs; failing to adequately train staff responsible for loan modifications; failing to establish adequate processes for loan modifications; allowing borrowers

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

[25] The settlement is evidenced by proposed Consent Judgments filed on April 4, 2012, in *United States v. Bank of America Corp.*, Case No. 1:12-cv-00361-RMC (D.D.C.), available at http://tinyurl.com/bvfa35z (Wells Fargo) and at http://tinyurl.com/cebqwtu (Bank of America).

[26] *United States v. Bank of America Corp.*, Case No. 1:12-cv-00361-RMC (D.D.C.), Compl. ¶ 51, at 22 (Mar. 14, 2012), available at http://tinyurl.com/9akz7mf.

to stay in trial modifications for excessive time; wrongfully denying modification applications; failing to respond to borrower inquiries; providing false or misleading information to consumers while referring loans for foreclosure during the loan modification application process; providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank; providing false or misleading information to consumers while scheduling and conducting foreclosures sales during the loan application process and during trial loan modification periods; misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts; failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications; falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification; miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers; misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner; failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by other security holders or claimants and failing to respond to borrowers reasonable requests for information and assistance; failing to assigned adequate staff resources with sufficient training to handle the demand from distressed borrowers; and misleading borrowers by providing false or deceptive reasons for denial of what modifications."[27]

103.    The Governments' complaint further alleges that mortgage servicers, including Bank of America and Wells Fargo and related affiliates, engaged in "unfair and deceptive

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

---

[27] *Id.* ¶ 58, at 24-26.

practices" including, but not limited to "failing to properly identify the foreclosing party; charging improper fees related to foreclosures; preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); preparing, executing or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits."   This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks; executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law; misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents; inappropriately charging servicing, document creation, recordation and other costs and expense related to foreclosures; and inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities."[28]

104.    The settlement did not, however, end the Banks' illegal foreclosure activities. According to Neil Barofsky, former Special Inspector General for the Troubled Asset Relief Program, and Matt Stoller, Fellow at the Roosevelt Institute, the violations are on-going and the settlement exhibits a tolerance for continued illegal foreclosures, "we're not actually talking about redressing harms that have stopped.   These harms are continuing.   These Banks are continuing to commit document fraud."[29]

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

---

[28] *Id.* ¶ 64, at 27-28.

[29] *See* http://www.jdsupra.com/legalnews/barofsky-dont-believe-hype-about-25b-50600/.

105.   As a result of the misconduct outlined above, the courts of New Jersey and elsewhere have taken steps to insure the integrity of servicing and foreclosure proceedings.

106.   On December 20, 2010, in response to widespread disclosure of irregularities stemming from "robo-signing," the Chief Justice of the New Jersey Supreme Court announced emergency revisions to the Rules of Court.[30]  The Court issued Administrative Order 01-2010 directing 24 foreclosure plaintiffs that had each filed 200 or more residential mortgage foreclosure actions in 2010 to provide certifications to a Special Master concerning their roles in the foreclosure process and to affirmatively demonstrate the absence of irregularities in their

---

[30] The New Jersey Supreme Court adopted amendments to Rules 4:64-1 and 4:64-2. The pertinent part of revised Rule 4:61-4 provides:
(2)       In all residential foreclosure actions, plaintiff's attorney shall annex to the complaint a certification of diligent inquiry:
      (A)       confirming that the attorney has communicated with an employee or employees of the plaintiff or of the plaintiff's mortgage loan servicer (i) who personally reviewed the complaint and confirmed the accuracy of its content, as mandated by paragraphs (b)(1) through (b)(10) and (b)(12) through (b)(13) of this rule, based on business records kept in the regular course of business by the plaintiff or the plaintiff's mortgage loan servicer, and (ii) who, if employed by the plaintiff's mortgage loan servicer, (a) identified the relationship between the mortgage loan servicer and the plaintiff, and (b) confirmed the authority of the mortgage loan servicer to act on behalf of the plaintiff; and
      (B)       stating the date and mode of communication employed and the name(s), title(s) and responsibilities in those titles of the plaintiff's or plaintiff's mortgage loan servicer's employee(s) with whom the attorney communicated pursuant to paragraph (a)(2)(A) of this rule.
      (C)       Plaintiff's attorney shall also annex to the complaint a certification executed by the attorney, attesting that the complaint and all documents annexed thereto comport with the requirements of Rule 1:4-8(a).

The Revised Rule 1:64-2 now provides in the relevant part:
      (c) Time; signatory.       The affidavit prescribed by this rule shall be sworn to not more than 60 days prior to its presentation to the court or the Office of Foreclosure. The affidavit shall be made either by an employee of the plaintiff, if the plaintiff services the mortgage, on the affiant's knowledge of the plaintiff's business records kept in the regular course of business, or by an employee of the mortgage loan servicer, on the affiant's knowledge of the mortgage loan servicer's business records kept in the regular course of business. In the affidavit the affiant shall confirm:
      (1)       that he or she is authorized to make the affidavit on behalf of the plaintiff or the plaintiff's mortgage loan servicer;
      (2)       that the affidavit is made based on a personal review of business records of the plaintiff or the plaintiff's mortgage loan servicer, which records are maintained in the regular course of business;
      (3)       that the financial information contained in the affidavit is accurate; and
      (4)       that the default remains uncured.
The affidavit shall also include the name, title, and responsibilities of the individual, and the name of his or her employer. If the employer is not the named plaintiff in the action, the affidavit shall provide a description of the relationship between the plaintiff and the employer.
      (d) Affidavit.       Plaintiff's counsel shall annex to every motion to enter judgment in a residential foreclosure action an affidavit of diligent inquiry stating: (1) that the attorney has communicated with an employee or employees of the plaintiff or plaintiff's mortgage loan servicer who (A) personally reviewed the affidavit of amount due and the original or true copy of the note, mortgage and recorded assignment, if any, being submitted and (B) confirmed their accuracy; (2) the date and mode of communication employed; (3) the name(s), title(s) and responsibilities in those titles of the plaintiff's employee(s) or the employee(s) of the plaintiff's mortgage loan servicer with whom the attorney communicated pursuant to this rule; and (4) that the aforesaid documents comport with the requirements of R. 1:4-8(a).

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

handling of residential mortgage foreclosure proceedings.  Defendant U.S. Bank was one of those foreclosure plaintiffs.[31]

107.    Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-59553-10, directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended.  Wells Fargo and Bank of America were two recipients of this show cause order.[32]

108.    On February 27, 2012, the New Jersey Supreme Court issued *U.S. Bank, N.A. v. Guillaume*, 209 N.J. 449, 38 A.3d 570 (2012), which held that U.S. Bank's Notice of Intention to foreclose failed to comply with the requirements of the New Jersey Fair Foreclosure Act because it gave the name and address of the servicer, rather than the lender U.S. Bank.  In furtherance of its holding in *Guillaume,* the Supreme Court issued an order on April 4, 2012, allowing plaintiffs who had sent deficient notices in uncontested residential mortgage foreclosure actions to seek orders to show cause why they should not be able to serve corrected notices and complete the foreclosures.  The April 4, 2012 Order also required such plaintiffs to send letters to the debtors explaining the reason for the corrected notice and informing the debtors of the procedure to object within 30 days from its receipt of the corrected notice.

---

[31] Upon affirmatively demonstrating to the satisfaction of the Special Master that it now has sufficient policies and procedures in place such that "there should not be irregularities" in its handling of foreclosure proceedings in New Jersey, U.S. Bank was dismissed from the administrative proceeding by Order dated September 21, 2011.

[32] Upon the finding of the Special Master that Wells Fargo had procedures in place that, if adhered to, would ensure that the information set forth in affidavits and certifications submitted in foreclosure proceedings was provided by an authorized affiant, that the affidavits and certifications would be properly executed, based upon knowledge gained through personal review of records, and upon the Respondents' agreement to submit to a "monitoring program" to ensure compliance with the showings of the Special Master,  the New Jersey Superior Court allowed Wells Fargo to resume the prosecution of uncontested residential mortgage foreclosure by Order entered August 5, 2011.

109.   Courts in other states have responded similarly to the foreclosure crisis by instituting corrective procedures.

110.   On October 20, 2010, the New York Court of Appeals implemented a new rule requiring attorneys handling foreclosure matters to sign a form verifying that the documentation presented to the court is valid.

111.   On November 8, 2010, the Ohio Cuyahoga County Court of Common Pleas, covering Ohio's largest county, announced a new residential mortgage foreclosure affidavit policy requiring attorneys to provide details of their communications with the representative of the party seeking foreclosure and certify that, to the best of their knowledge, the pleadings and other court filings are complete and accurate.

112.   In Maryland, on April 4, 2008, the state's highest court approved new emergency measures that provide for examiners and/or special masters to scrutinize the documentation in foreclosure matters.  The new rules specifically allow Maryland courts to pass on the cost of the examinations to the firms foreclosing on debtors.

113.   The wrongful conduct enumerated in the settlement proceeding and consent orders referenced above caused damage to Cerificateholders such as Plaintiff.  It is unusual for a borrower to pay improper fees related to foreclosure and default-related services because the borrower is in default and lacks the resources to pay.  Instead, the improper fees are passed along to investors such as Plaintiff. Further, the actions that push a borrower into default or prevent a net-present value positive modification from taking place reduce the proceeds to investors.

114.   By charging excessive fees, the Banks used the loans in the Trusts for their own benefit and to the detriment of both borrowers and investors such as Plaintiff.

115.   The settlement awards the Banks "credits" toward the payment of damages in exchange for certain actions involving loans in the Trusts, which loans are held by Defendant for the benefit of investors such as Plaintiff – not for the benefit of the Master Servicer.   Thus, the Banks can use the assets of one of their victims – investors – to pay down the amount of damages owed under the settlement.

116.   Further, the failings of U.S. Bank and Wells Fargo give rise to additional expenses associated with foreclosures.   Such expenses include, but are not limited to: (a) sanctions for misconduct in legal proceedings; (b) attorneys' fees and costs of filing a foreclosure complaint dismissed or delayed due to improper documentation; (c) attorneys' fees and costs of re-filing or amending a foreclosure complaint or affidavit; (d) attorneys' and other professional fees related to defenses against government investigations and claims; (e) costs of evaluating servicing procedures to ensure compliance with law; (f) the payment to borrowers and/or government entities of settlements, fines, penalties, or judgments related to this issue; (g) increased costs of future foreclosures; (h) "carrying costs" associated with foreclosure delay, such as force-placed insurance, default-related services, and taxes; (i) losses associated with increased deterioration to the underlying property due to vandalism, deferred maintenance, and neglect; and (j) costs associated with additional foreclosure requirements and procedures implemented as a result of Defendant's and the Master Servicer's misconduct.

117.   Improper foreclosures result in further losses related to maintenance of the foreclosed-upon property.   Upon foreclosure, title to the home passes to the lender before the property is marketed and sold to a third party.   At this stage in the process, the property is called "Real Estate Owned" (*i.e.*, real estate owned by the lender).   Real Estate Owned has certain "costs of carry", which are necessary to preserve the value of the property and get the best

possible price from a buyer to reduce the deficiency owed by the borrower and maximize the return to the Trust. Such costs include property maintenance, force-placed insurance coverage, taxes, and other expenses.

118. Further, once a property becomes Real Estate Owned, it cannot be allowed to deteriorate so that it becomes unsellable and a public nuisance. Such practices damage both the borrower and the investor by increasing the deficiency owed by the borrower on the loan and the loss associated with the property, as well as the community at large.

119. An example of this practice is alleged by the City of Buffalo in a complaint (the "Buffalo Complaint") styled *City of Buffalo v. ABN AMRO Mortgage Group, Inc.*, Case No. 2008002200 (N.Y. Sup. Ct. Feb. 20, 2008), which states that various Master Servicers were granted judgments of foreclosure for specifically identified properties within the City of Buffalo and thereafter permitted or allowed homes on the properties to "become so dilapidated, deteriorated, abandoned and/or decayed so as to present a danger to the health, safety and welfare of the public."

120. By contrast, according to the president of the National Community Stabilization Trust, a "quick sale" of Real Estate Owned property "means lower carrying and marketing costs, less property deterioration and vandalism, and other savings."[33]

## C. Defendant U.S. Bank's Conflict of Interest

121. Defendant U.S. Bank, as Trustee, has an unwaivable duty to avoid conflicts of interest and to act in the interest of Certificateholders such as Plaintiff. However, instead of acting in the interest of Certificateholders, U.S. Bank has acted to promote its own self-interest. As demonstrated herein, U.S Bank was virtually precluded from taking the required action

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

[33] Craig Nickerson, *Acquiring Property for Neighborhood Stabilization: Lessons Learned from the Front Lines*, REO and Vacant Properties: Strategies for Neighborhood Stabilization (Federal Reserve Banks of Boston and Cleveland and the Federal Reserve Board), at 92.

against Wells Fargo, Countrywide and the other servicers since it was engaged in the same misconduct.

122. However, the PSAs required U.S. Bank to take action to prevent the Master Servicer from engaging in illicit and/or illegal acts with respect to loans in the Trusts U.S. Bank held for the benefit of Plaintiff and other Certificateholders.

123. By at least October 19, 2011, the abuses by the Master Servicer, robo-signers and other third-parties became so prevalent, and so well known, that the Defendant, as Trustee for the Trusts herein, was imputed with the knowledge and facts set forth in this Complaint and should have acted to protect the Plaintiff as required by the its Trust Indenture Act, contractual and common law duties.

124. For example, with regard to the robo-signing by LPS, DOCX, and/or the Master Servicer, Defendant could have: (a) demanded that this practice cease; (b) sought a Court order enjoining the practice; and/or (c) reported the practice to law enforcement. However, Defendant could not exercise any of these remedies, as Defendant was committing the same violations.

125. Defendant's demonstrated conflict of interest prevented, and prevents, it from using its discretionary powers to prevent LPS, DOCX, or the Master Servicer from engaging in illicit and/or illegal acts with respect to any loans that Defendant holds for the benefit of Plaintiff.

126. In the Consent Order signed by Defendant, the OCC made findings that U.S. Bank itself engaged in improper foreclosure and servicing violations. Indeed, Defendant engaged in the same illicit and/or illegal acts committed by the Master Servicer to the Trusts. Because of this conflict, Defendant, as Trustee for the Trusts, failed to act for Plaintiff's benefit.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

- 34 -

127.   Defendant's actions and inaction have harmed Plaintiff, by proximately causing substantial and unwarranted losses to the investments in the Trusts. Since the date of purchase, Plaintiff has taken impairment charges on its Certificates in CSMC 2006-8 in the amount of $1,024,253.00, all of which are attributable to losses from the violations alleged in this Complaint. Likewise, since the date of purchase, Plaintiff has taken impairment charges on its Certificates in MALT 2007-1 in the amount of $2,555,088.00, all of which are also attributable to losses from the violations alleged in this Complaint.

128.   These losses may continue to mount and have yet to be accounted for because the full impact of Defendant's failures is only realized on individual properties after the foreclosure process is completed.

## COUNT I
### VIOLATION OF THE TRUST INDENTURE ACT

129.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

130.   U.S. Bank violated multiple provisions of the Trust Indenture Act.

131.   First, the Trust Indenture Act requires that U.S. Bank inform RMBS certificateholders of breaches of the PSAs within ninety days after their occurrence. 15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)). As set forth herein, there were numerous breaches, including the failure of the Seller and Depositor to cure defects in the mortgage files and/or to substitute conforming loans for the defective loans in the Trusts, the failure of the Master Servicer to enforce those repurchase obligations upon discovering breaches of representations and warranties relating to the credit quality of the loans in the Trusts, and the servicing failures reported herein. Given the great importance of those defaults to the RMBS certificateholders' interests, U.S. Bank had no good faith reason for failing to provide notice of those defaults. Accordingly, by failing to provide such notice, Defendant violated the Trust Indenture Act.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

- 35 -

132.   Second, in case of default, the Trust Indenture Act requires that U.S. Bank exercise its rights and powers under the PSAs as a prudent person would, under those circumstances, in the conduct of his own affairs. 15 U.S.C. §77ooo(c). Again, given the obvious importance of the defaults set forth herein, which impaired the rights of certificateholders to collect their full principal and interest and which reduced the value of the RMBS, any prudent person under those circumstances would have exercised all of his rights to, among other things, obtain complete mortgage files, cure any defects in the mortgage files and/or substitute conforming loans, to sue to require the repurchase of loans that breached their representations and warranties, and to prevent and/or seek compensation for the servicing failures.  By failing to exercise its rights in those circumstances, Defendant violated the Trust Indenture Act.

133.   Defendant is liable to Plaintiff and the other Certificateholders within CSMC 2006-1 and MALT 2007-1 for damages incurred as a result of its violations of the Trust Indenture Act.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

    A.    Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

    B.    Enjoining Defendant against allowing robo-signing for any loans in the Trust;

    C.    Awarding attorneys' fees to Plaintiff; and

    D.    Granting such other and further relief as the Court deems just and proper.

## COUNT II
### BREACH OF DUTY OF LOYALTY

134.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

135.   As Trustee, Defendant has an unwaivable duty to avoid conflicts of interest.

STRASSER &
ASSOCIATES
. PROFESSIONAL CORPORATION

136. Under the PSAs, Defendant holds the loans for the benefit of Plaintiff and the other investors in the Trusts.

137. Under the PSAs, Defendant had the ability and duty to prevent the Master Servicer from engaging in illegitimate, illicit, and/or illegal acts with respect to any loans that Defendant held for the benefit of Plaintiff.

138. The abuses by the Master Servicer, robo-signers and other third-parties became so prevalent, and so well known, that the Defendant, as Trustee for the Trusts herein, was imputed with the knowledge and facts set forth in this Complaint and should have acted to protect the Plaintiff as required by its contractual and common law duties.

139. Defendant engaged in the same acts committed by the Master Servicer to the Trusts. This conflict made it impossible for the Defendant, as Trustee for the Trusts, to act for Plaintiff's benefit.

140. Defendant's actions have harmed and continue to harm the Plaintiff and the other Certificateholders in CSMC 2006-1 and MALT 2007-1 by proximately causing substantial and unwarranted losses to the investments in the Trusts. These losses continue to mount as the deterioration, the costs of foreclosure, and carrying costs on homes increase each day.

141. As a result of Defendant's breach of its duty of loyalty and duty to remain conflict-free Plaintiff has been severely damaged in the matter set forth in the Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

    A.     Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

    B.     Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

STRASSER &
ASSOCIATES
( PROFESSIONAL CORPORATION )

C.      Granting such other and further relief as the Court deems just and proper.

## COUNT III
### BREACH OF FIDUCIARY DUTY

142.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

143.    As Trustee, Defendant has an unwaivable duty to avoid conflicts of interest.

144.    Under the PSAs, Defendant holds the loans for the benefit of Plaintiff and the other investors in the Trusts.

145.    Under the PSAs, Defendant had the ability and duty to prevent the Master Servicer from engaging in illegitimate, illicit and/or illegal acts with respect to any loans that Defendant held for the benefit of Plaintiff.

146.    The abuses by the Master Servicer, robo-signers and other third-parties became so prevalent, and so well known, that the Defendant, as Trustee for the Trusts herein, was imputed with the knowledge and facts set forth in this Complaint and should have acted to protect the Plaintiff as required by its contractual and common law duties.

147.    Defendant engaged in the same acts committed by the Master Servicer to the Trusts. This conflict made it impossible for Defendant, as Trustee for the Trusts, to act for Plaintiff's benefit.

148.    Defendant's actions have harmed and continue to harm the Plaintiff and the other Certificateholders by proximately causing substantial and unwarranted losses to the investments in the Trusts.  These losses continue to mount as the deterioration, costs of foreclosure, and carrying costs on homes increase each day.

149.    As a result of Defendant's breach of its duty of loyalty and duty to remain conflict-free Plaintiff has been severely damaged in the matter set forth in the Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

- 38 -

A. Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

B. Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

C. Granting such other and further relief as the Court deems just and proper.

**COUNT IV**
**BREACH OF CONTRACT**

150. Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

151. Pursuant to the PSAs, Defendant had a duty to hold the loans for the benefit of the plaintiff and other Certificateholders.

152. As set forth in this Complaint, Defendant did not hold the loans for the benefit of Certificateholders.

153. For example, certain loans were held for the benefit of affiliates of the Master Servicer whose interests in maximizing their own profits conflicted with the interests of the Certificateholders such as Plaintiff.

154. Despite receiving notice of and/or discovering potential breaches of representations and warranties in loans held by the Trust, the Trustee failed to perform its contractual obligation to ascertain whether such breaches had occurred, and if they had, to give prompt notice to the other parties of such breaches.

155. As a result of Defendant's breach of contract, Plaintiff and the other Certificateholders have been severely damaged in the manner set forth in this Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

A. Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

STRASSER &
ASSOCIATES
A PROFESSIONAL CORPORATION

- 39 -

B.   Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

C.   Granting such other and further relief as the Court deems just and proper.

### COUNT V
### NEGLIGENCE

156.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

157.   At a minimum, Defendant had a duty to perform its ministerial duties with due care.

158.   As set forth in this Complaint, Defendant failed to perform its ministerial duties with due care.

159.   For example, Defendant was required to execute certain documents associated with the Trust when exercising its right to foreclose on a property.  Instead, Defendant allowed LPS, DOCX, MERS, Inc., or the Master Servicer to sign those documents, often allowing an employee of another company to sign as an officer of Defendant under oath and outside the presence of a notary public.

160.   As a result of Defendant's negligence, Plaintiff and the other Certificateholders have been severely damaged in the manner set forth in this Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

A.   Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

B.   Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

C.   Granting such other and further relief as the Court deems just and proper.

STRASSER &
ASSOCIATES
A PROFESSIONAL CORPORATION

- 40 -

## COUNT VI
### INJUNCTIVE RELIEF

161.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

162.    The conduct of the Defendant had caused irreparable injury and harm to the Plaintiff and other similarly situated which harm will continue unless the Defendant is restrained and enjoined from acting as a trustee and engaging in or allowing such conduct in the future.

163.    Plaintiff and the other Certificateholders have no adequate remedy at law by which to prohibit the Defendant from continuing to engage in or allow the conduct described herein and allege that the same will continue unabated unless enjoined by order of this Court.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

A.    Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

B.    Granting such other and further relief as the Court deems just and proper.

## COUNT VII
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

164.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

165.    Plaintiff and the other Certificateholders were in contractual privity with Defendant.

166.    Covenants of good faith and fair dealing arise when parties enter into contracts such as those at issue in the instant matter and such covenants in fact arose in the instant matter.

167.    Pursuant to the PSAs, Defendant had a duty to hold the loans for the benefit of the plaintiff and other Certificateholders.

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, William I. Strasser, Esq. is designated as trial counsel in this matter.

STRASSER & ASSOCIATES, P.C.
Attorneys for Plaintiff, VNB Realty, Inc.

By: _____
WILLIAM I. STRASSER, ESQ.

Dated: May 29, 2013

## NOTICE PURSUANT TO R. 1:5-1(a) AND R. 4:18-4(c)

Take notice that, pursuant to Rule 1:5-1(a) and 4:18-4(c), Plaintiff hereby demands that each party named in the Complaint that serves or receives pleadings of any nature (including discovery requests) to or from any other party to the action, forward copies of same along with any documents provided in answer or response thereto to counsel for Plaintiff and take notice that this is a continuing demand.

STRASSER & ASSOCIATES, P.C.
Attorneys for Plaintiff, VNB Realty, Inc.

By: _____
WILLIAM I. STRASSER, ESQ.

Dated: May 29, 2013

STRASSER &
ASSOCIATES
. PROFESSIONAL CORPORATION

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned certifies that, upon their initial review of this matter, the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, that no other action or arbitration proceeding is currently contemplated and that they are unaware of any other parties who currently should be joined to this action.

STRASSER & ASSOCIATES, P.C.
Attorneys for Plaintiff, VNB Realty, Inc.

By: _____
WILLIAM J. STRASSER, ESQ.

Dated: May 29, 2013

STRASSER &
ASSOCIATES
A PROFESSIONAL CORPORATION

- 44 -

168.    As set forth in this Complaint, Defendant did not hold the loans for the benefit of Certificateholders.

169.    For example, certain loans were held for the benefit of affiliates of the Master Servicer whose interests in maximizing their own profits conflicted with the interests of the Certificateholders such as Plaintiff.

170.    At all times relevant hereto, Plaintiff acted in good faith and yet, Defendant failed to act in good faith when rendering performance under the PSAs.

171.    Defendant's actions as aforesaid violate the covenants of good faith and fair dealing that arose relative to the transaction.

172.    As a result of Defendant's conduct as aforesaid, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order as follows:

A.    Awarding Plaintiff compensatory and punitive damages, including, but not limited to the $3,579,341.00 in impairment charges already taken;

B.    Enjoining Defendant against allowing robo-signing for any loans in the Trust; and

C.    Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,
STRASSER & ASSOCIATES, P.C.
Attorneys for Plaintiff, VNB Realty, Inc.

By: _____
WILLIAM I. STRASSER, ESQ.

Dated: May 29, 2013

STRASSER &
ASSOCIATES
PROFESSIONAL CORPORATION

- 42 -