MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000
*Attorneys for Defendant*
*U.S. Bank National Association*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VNB REALTY, INC., a wholly owned subsidiary of Valley National Bank,<br><br>                    Plaintiff,<br>      vs.<br><br>U.S. BANK, N.A.,<br><br>                    Defendant. | Civil Action No. 13-cv-04743-WJM-MF<br><br>DOCUMENT ELECTRONICALLY FILED<br><br>MOTION DATE: October 21, 2013 |

## DEFENDANT U.S. BANK NATIONAL ASSOCIATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

*Of Counsel:*

**MORGAN, LEWIS & BOCKIUS LLP**
Michael S. Kraut (*pro hac vice* admission pending)
101 Park Avenue
New York, New York 10178
(212) 309-6000

**MORGAN, LEWIS & BOCKIUS LLP**
Lisa M. Campisi (LC1018)
101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendant U.S. Bank National Association*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ....................................................1

II.   BACKGROUND ......................................................................5

    A.   Role of the Seller and Depositor ........................................5

    B.   The Role of the Servicers and the Master Servicer............................6

        1.   The RMBS Trustee Is Not Involved in, and Is Not Responsible for, Servicing ....................................7

    C.   The RMBS Trustee ...........................................................9

        1.   The Role of an RMBS Trustee ................................9

        2.   U.S. Bank Has No Pre-Default Duty to Investigate Unless Properly Directed To Do So By Certificateholders....11

III.  ARGUMENT ........................................................................13

    A.   The "No-Action" Clause Bars Claims Against U.S. Bank...............13

    B.   Plaintiff's "Robo-signing" Theory Is Not Supported by Factual Allegations or the PSAs, and Is Implausible ....................................16

        1.   Plaintiff Pleads General Allegations of Servicer Robo-Signing, Not that Robo-Signing Actually Occurred in Connection with a Single Loan in the Trusts........................16

        2.   The Complaint Fails to Adequately Plead that U.S. Bank Had Knowledge of Alleged Robo-Signing By Servicers........19

        3.   U.S. Bank Had No Duty to Police Alleged Servicer Misconduct ...........................................................21

        4.   Plaintiff Does Not Plead How Robo-Signing Harmed It ........23

    C.   Plaintiff Fails to Establish that the Trustee Improperly Failed to Compel the Sellers to Repurchase Loans .........................................28

    D.   Each of Plaintiff's Seven Counts Fails ............................................32

        1.   The TIA Claim Fails Because Plaintiff Did Not Allege an EOD...................................................................32

        2.   The Breach of Contract Claim Is Unintelligible ....................35

        3.   The Breach of Fiduciary Duty Claim Should Be Dismissed ...........................................................35

## TABLE OF CONTENTS
(continued)

**Page**

4.    Plaintiff's Duty of Loyalty Claim Should Be Dismissed ........37

5.    Count V (Negligence) Is Inadequately Pled ...........................38

6.    No Cognizable "Injunctive Relief" Cause of Action
      Exists ......................................................................................39

7.    Plaintiff Fails to State a Claim for Breach of Implied
      Covenant of Good Faith and Fair Dealing ("ICGFFD")
      ................................................................................................39

IV.    CONCLUSION .........................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*,
   896 N.E.2d 61 (N.Y. 2008) ........................................................................passim

*AMBAC Indemnity Corp. v. Bankers Trust Co.*,
   573 N.Y.S.2d 204 (N.Y. Sup. Ct. 1991) ............................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................2, 13

*Baker v. Summit Bank*,
   46 F. App'x. 689 (3d Cir. 2002) .......................................................................34

*Bankers Ins. Co. v. DLJ Mortgage Capital, Inc.*,
   No. 8:10-cv-0419-T-27EAJ, 2011 WL 2470226 (M.D. Fla. Mar. 17,
   2011) ................................................................................................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................2, 13

*Block v. BAC Home Loans Servicing LP*,
   No. 11–11181, 2012 WL 2031640 (E.D. Mich. June 6, 2012) ........................18

*Butler v. Wells Fargo Bank, N.A.*,
   No. MJG–12–2705, 2013 WL 145886 (D. Md. Jan. 11, 2013).........................18

*Cerecedes v. U.S. Bankcorp*,
   No. CV 11-219(CAS), 2011 WL 1666938 (C.D. Cal. Apr. 29, 2011) ..............18

*CFIP MasterFund, Ltd. v. Citibank, N.A.*,
   738 F. Supp. 2d 450 (S.D.N.Y. 2010) ........................................................26, 27

*Chaouni v. Ali*,
   963 N.Y.S.2d 27 (First Dep't 2013) ...................................................................8

*Chiste v. Hotels.com L.P.*,
   756 F. Supp. 2d 382 (S.D.N.Y. 2010) ..............................................................39

# TABLE OF AUTHORITIES

**Page(s)**

*Chruby v. Kowaleski*,
  No. 12-3132, 2013 WL 4010243 (3d Cir. Aug. 7, 2013) .................................39

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
  70 N.Y.2d 382 (N.Y. 1987)........................................................................36, 38

*Coca-Cola N. Am. v. Crawley Juice, Inc.*,
  No. 09-CV-3259(JG)(RML), 2011 WL 1882845 (E.D.N.Y. May 17,
  2011) .....................................................................................................................39

*Crawford v. Countrywide Home Loans, Inc.*,
  647 F.3d 642 (7th Cir. 2011)..............................................................................18

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992)...............................................................................14

*E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank*,
  953 F.2d 963 (5th Cir. 1992) .............................................................................27

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011) .......................................................passim

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988).........................................................................27, 37

*FTC v. Countrywide Home Loans, Inc.*,
  No. 10-CV-4193 (C.D. Cal. June 7, 2010), ECF No. 1 ...................................30

*G.D. Searle & Co. v. Medicorp Commc'ns, Inc.*,
  843 F. Supp. 895 (S.D.N.Y. 1994) ....................................................................36

*In re Enron Corp. Secs., Derivative & "ERISA" Litig.*,
  Nos. H-01-3624 & 03-5808, 2008 WL 744823 (S.D. Tex. Mar. 19, 2008) ......10

*In re Prudence-Bonds Corp.*,
  76 F. Supp. 643 (E.D.N.Y. 1948)......................................................................37

*Islamic Ass'n of DeSoto, Texas, Inc. v. Mortg. Elec. Registration Sys., Inc.*,
  No. 3:12–CV–0613–D, 2012 WL 2196040 (N.D. Tex. June 15, 2012)............18

*James v. ReconTrust Co.*,
  845 F. Supp. 2d 1145 (D. Or. 2012)..................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Knights of Columbus v. Bank of N.Y. Mellon*,
   No. 651442/2011 (filed N.Y. Sup. Ct. Aug. 16, 2011) ....................................22

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)...........................................................................18

*Macawile v. Pro30 Funding*,
   No. 2:12–CV–00567–MCE–DAD, 2012 WL 2912349 (E.D.Cal. July 16,
   2012) ............................................................................................................18

*Madlaing v. JPMorgan Chase Bank, N.A.*,
   No. CV F 12-2069(LJO), 2013 WL 2403379 (E.D. Cal. May 31, 2013)..........18

*Magten Asset Mgmt. Co. v. Bank of N.Y.*,
   No. 600410/10, 2007 WL 1326795 (N.Y. Sup. Ct. May 8, 2007) ...................10

*Meckel v. Cont'l Res. Co.*,
   758 F.2d 811 (2d Cir. 1985)...........................................................................10

*Metro. W. Asset Mgmt. v. Magnus Funding Ltd.*,
   No. 03 Civ. 5339(NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004).....36, 38

*Mickelson v. Chase Home Fin. LLC*,
   No. C11–1445 MJP, 2011 WL 5553821 (W.D. Wash. Nov. 14, 2011) ...........18

*Millennium Partners, L.P. v. U.S. Bank Nat'l. Ass'n*,
   No. 12 Civ. 7581(HB), 2013 WL 1655990 (S.D.N.Y. Apr. 17, 2013)........37, 38

*Nottage v. Bank of N.Y. Mellon*,
   No. 12–00418 JMS, 2012 WL 5305506 (D. Haw. Oct. 25, 2012) ...................18

*O'Keefe v. Sprout Bauer, Inc.*,
   970 F.2d 1244 (3d Cir. 1992)...........................................................................8

*OEI v. Citibank, N.A.*,
   957 F. Supp. 492 (S.D.N.Y. 1997) ..................................................................36

*Orzoff v. Bank of Am., N.A.*,
   2:10-cv-2202(JCM), 2011 WL 1539897 (D. Nev. Apr. 22, 2011)...................18

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*,
   No. 98 CIV 6907, 2000 WL 877004 (S.D.N.Y. June 30, 2000) .......................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Peak Partners, L.P. v. Republic Bank*,
    191 F. App'x 118 (3d Cir. 2006)........................................................9

*Peterson v. GMAC Mortg., LLC*,
    No. 11–11115–RWZ, 2011 WL 5075613 (D. Mass. Oct. 25, 2011)................18

*Raymond James & Assocs. v. Bank of N.Y. Trust Co.*
    No. 8:07-CV-239-T-27(TBM), 2008 WL 4279629 (M.D. Fla. Sept. 18,
    2008) ........................................................................................37

*Retirement Bd. v. The Bank of New York Mellon*,
    No. 13-661 (2d Cir.) ....................................................................11

*Reuban H. Donnelley Corp. v. Mark I Marketing Corp.*,
    893 F. Supp. 285 (S.D.N.Y. 1995) ...................................................39

*Ruddy v. U.S. Postal Service*,
    455 F. App'x. 279 (3d Cir. 2011).......................................................5

*Schultz v. BAC Home Loans Servicing, LP*,
    No. CV–11–00558–PHX–NVW, 2011 WL 3684481 (D. Ariz. Aug. 23,
    2011) ........................................................................................18

*Sembly v. U.S. Bank Nat'l Ass'n.*,
    No. 11-12322, 2012 WL 32737 (E.D. Mich. Jan. 6, 2012)..............................18

*Spread Enters., Inc. v. First Data Merchant Servs. Corp.*,
    No. 11-cv-4743 (ADS), 2012 WL 3679319 (E.D.N.Y. Aug. 22, 2012)............39

*Sterling Fed. Bank F.S.B. v. The Bank of New York Mellon*,
    No. 09-C-6904, 2012 WL 3101699 (N.D. Ill. July 30, 2012) ...........................15

*Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*,
    No. 09-C-6904, 2010 WL 3324705 (N.D. Ill. Aug. 20, 2010)....................14, 15

*Toone v. Wells Fargo Bank, N.A.*,
    716 F.3d 516 (10th Cir. 2013).....................................................17, 18

*U.S. Bank Nat'l Assoc. v. Ibanez*,
    941 N.E.2d 40 (Mass. 2011) ..........................................................7

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**STATUTES**

15 U.S.C. § 77ccc ..................................................................................................9

15 U.S.C. §77ooo(a)(1)..........................................................................................11

15 U.S.C.A. § 77ooo(b) .....................................................................................32, 34

15 U.S.C.A. § 77ooo(b)-(c)...............................................................................32

Trust Indenture Act........................................................................... 11, 32, 33, 34

Defendant U.S. Bank National Association ("U.S. Bank") submits this memorandum of law in support of its motion to dismiss all claims in the May 29, 2013 complaint (the "Complaint") filed by VNB Realty, Inc. ("Plaintiff").[1]

## I.   PRELIMINARY STATEMENT

Plaintiff invested in two complex residential mortgage-backed securitization ("RMBS") trusts that are backed by housing loans and tied to payments made by borrowers on their loans (the "Trusts").[2]  Plaintiff invested during the height of the housing market bubble and, not surprisingly, alleges that it lost money.

Ignoring the complete meltdown of the financial markets, especially the real estate markets, in recent years, Plaintiff points its finger everywhere in assigning blame for its losses.  Plaintiff sues U.S. Bank, the "RMBS Trustee" (or "Trustee") of the Trusts, and, although not named as defendants, Plaintiff also blames every other player in the mortgage industry, including loan originators (¶¶ 53-55), home owners (¶¶ 93, 95), sellers (¶¶ 41-45, 65), and mortgage loan servicers and master servicers (¶¶ 46-47, 65, 66-90).  Plaintiff even blames new laws and rules imposed by the government (¶ 87).  In its annual report to its shareholders, Plaintiff took a different tack, attributing its losses to ongoing volatility in the economy.  *See supra* III.B.4.  In litigation involving its investment in a different RMBS trust, Plaintiff

---

[1]  Citations to "¶ __" refer to paragraphs of the Complaint.
[2] The Trusts are CSMC Mortgage-Backed Pass-Through Certificates 2006-8 ("CSMC 2006-8") and MASTR Alternative Loan Trust 2007-1 ("MALT 2007-1").

blames virtually all of the parties involved in the securitization of loans (*e.g.*, the sponsor, depositor, servicer, and underwriters).  *See* Complaint, *VNB Realty, Inc. v. Bank of Am.*, No. 1:11-cv-06805-DLC, ECF No. 1 (S.D.N.Y. Sept. 28, 2011).

Plaintiff's suit against U.S. Bank is barred under binding contractual "no-action" provisions set forth in the comprehensive "pooling and servicing agreements" ("PSAs") governing the Trusts.  These provisions require a Trust investor, known as a "Certificateholder," to follow certain specified conditions precedent before commencing litigation.  Plaintiff failed to comply with these provisions, and therefore the Complaint must be dismissed.

But even if the Court were to look past the "no-action" clause requirements, Plaintiff's claims do not pass muster under the pleading and plausibility requirements of *Iqbal* and *Twombly* and could as easily be dismissed on that basis.

The rights and obligations of the parties that structured and/or administer the Trusts are spelled out in the PSAs.  U.S. Bank serves as the "RMBS Trustee" for the Trusts, and the PSAs expressly limit its responsibilities and liabilities.  Ignoring these limitations, Plaintiff has conjured up two ill-pled theories of liability:

As its primary theory, Plaintiff seeks to hold U.S. Bank responsible for alleged errors by 14 other financial institutions known as mortgage "Servicers," which collect payments for the mortgage loans in the Trusts and, if a borrower defaults on a mortgage loan, initiate and direct foreclosure proceedings.

-2-

The PSAs expressly provide that U.S. Bank *cannot* be liable for the Servicers' conduct.  Undeterred, Plaintiff alleges that: (i) certain mortgage Servicers engaged in purported improprieties when signing foreclosure-related documents (which Plaintiff labels "robo-signing");[3] (ii) as a result of regulatory settlements by Servicers and the implementation of new foreclosure laws and procedures designed to prevent Servicers' robo-signing, the costs of foreclosures are now higher than when Plaintiff invested in the Trusts; and (iii) U.S. Bank failed to stop mortgage Servicers from robo-signing.  Although robo-signing was allegedly done by Servicers, Plaintiff blames U.S. Bank.  These claims fail for numerous reasons:

- The Complaint fails to allege that *any* documents relating to the Trusts were robo-signed.  Plaintiff alleges only that a few of the 14 Servicers for the Trusts were linked to robo-signing and, even as to those few, Plaintiff draws no nexus between alleged robo-signing generally and any loan in the Trusts or any loss incurred by Plaintiff.

- Plaintiff claims that U.S. Bank breached a contractual duty to prevent servicing problems but cites no contract provision that U.S. Bank purportedly breached, and the PSAs expressly provide that U.S. Bank has no obligation to ferret out such issues.

- Plaintiff attempts to impute U.S. Bank with knowledge of Servicers' robo-signing by October 2011, well after extensive government investigations occurred and certain Servicers settled with federal regulators.  ¶¶ 81-82.  Those settlements imposed on settling Servicers detailed obligations to enhance their practices and identify and remediate prior issues.  Thus, even

---

[3] Plaintiff defines "robo-signing" to mean "the practice of signing mortgage assignments, satisfactions and other mortgage-related documents in assembly-line fashion, often with a name other than the affiant's own, and swearing to personal knowledge of facts of which the affiant has no knowledge."  ¶ 69.

if U.S. Bank had a duty to find and stop robo-signing, which it did not, the issue was addressed months earlier.

- Plaintiff's damages theory makes no sense. Plaintiff argues that regulatory settlements and laws designed to prevent robo-signing led to increased costs and a slower "enhanced foreclosure processes." ¶ 87. Of course, U.S. Bank, as RMBS Trustee, did not implement those laws, did not agree to insure investors against the possibility that states might enhance their foreclosure processes (to address servicing conduct about which Plaintiff complains).

- Plaintiff's claim that U.S. Bank failed to police Servicers' conduct due to a conflict of interest is not plausible because no conflict of interest existed. Moreover, Plaintiff fails to plead that, absent the so-called conflict, U.S. Bank would have acted differently.

Plaintiff's fallback theory is that U.S. Bank is responsible for losses purportedly due to "likely" breaches of representations and warranties by banks that sold mortgage loans that were conveyed to the Trusts ("Sellers"). As with the servicing-related allegations, Plaintiff fails to adequately plead that such breaches actually occurred, that U.S. Bank had knowledge of them, or that U.S. Bank had any duty to act. The PSAs unequivocally provide that U.S. Bank has *no* duty to investigate so-called "likely" breaches absent written direction from at least 25% of authorized Certificateholders because any investigations performed by the Trustee would be funded directly by Certificateholders or by Trust assets that belong to all of the Certificateholders. This requirement prevents the Trustee and smaller investors, such as Plaintiff, from wasting Trust assets on frolics and detours not wanted by larger investors with more at risk. The Complaint does not allege that any Certificateholder invoked that contractual right; to the contrary,

-4-

allegations in the Complaint reflect that at least one Certificateholder with a much larger stake than Plaintiff decided to pursue its own action against Sellers without the assistance of the Trustee.

For these reasons, and others set forth below, Plaintiff has not come close to stating a claim against U.S. Bank, and the Court should dismiss the Complaint.

## II.   BACKGROUND

In an RMBS securitization, a financial institution sells mortgage loans and sophisticated Certificateholders, such as Plaintiff,[4] invest in certificates evidencing beneficial interests in those mortgage loans.  All other parties to the transaction, including the RMBS Trustee, are service providers that have no economic stake in the transaction and only have limited duties that are defined in the PSAs.

### A.   Role of the Seller and Depositor

When an RMBS securitization closes, a mortgage loan Seller transfers to a depositor loans that it originated or purchased.[5]  The depositor conveys title to the

---

[4]  Plaintiff is a subsidiary of Valley National Bank, which holds more than $16 billion in assets, including more than $1.2 billion in MBS.  *See* Valley National Bancorp Form 10-K for Fiscal Year 2012, at pp. 3, 22, attached as Exhibit A to the Certification of Kurt W. Rademacher ("Rademacher Cert.") dated September 23, 2013 and filed today.

[5]  *See generally* CSMC 2006-8 PSA dated Sept. 1, 2006 ("CSMC PSA") at § 2.01(a)-(b) and MALT 2007-1 PSA dated Jan. 1, 2007 ("MALT PSA", and together with the CSMC PSA, the "PSAs"), Art. I.  The PSAs are attached as Exs. B and C, respectively, to the Rademacher Cert., and are publicly available on the SEC's website.  The Court may consider them, other publicly-filed documents, and documents referenced in the Complaint when adjudicating this motion to dismiss.

loans to the RMBS Trustee for the benefit of the Certificateholders of the Trusts.[6]

The Seller makes certain representations and warranties to the depositor and the RMBS Trustee for the benefit of the trust and Certificateholders.  *See, e.g.,* MALT PSA, § 2.03, Schedule II.  The RMBS Trustee is entitled to rely on such representations and is not expected to investigate their veracity.  *See, e.g.,* CSMC PSA, §§ 9.01(1) & 9.02(a)(v).  In fact, the RMBS Trustee expressly disclaims any representations regarding the mortgage loans.  *See* CSMC PSA, § 9.03; MALT PSA, § 8.03.  If, during the life of an investment in a Trust, Certificateholders believe that the Seller breached some of its representations and warranties, they may direct the RMBS Trustee to investigate if they have sufficient ownership to do so, as explained *infra* at II.C.2.[7]  Although such investigations have occurred on numerous transactions not at issue here, Plaintiff does not allege that any Certificateholder invoked the right to direct the RMBS Trustee to investigate.

**B.    The Role of the Servicers and the Master Servicer**

Servicers, not trustees, maintain the day-to-day relationship with individual mortgage borrowers by sending statements and correspondence, performing customer service, collecting payments, notifying borrowers upon default, working with borrowers to cure defaults or modify loans, and instituting foreclosure actions.

---

*See Ruddy v. U.S. Postal Service*, 455 F. App'x. 279, 283 (3d Cir. 2011).

[6] CSMC PSA, § 2.01(a); MALT PSA, § 2.01(a).  For MALT 2007-1, the seller is referred to as "Transferor."  MALT PSA, Art. I.

[7] *See* MALT PSA, § 8.02(iv); CSMC PSA, § 9.02(a)(v).

The PSAs appoint one or more "Master Servicers" that are "responsible for management of the loan portfolio owned by the trust, including establishing policies and procedures for servicing . . . ."[8]  The Master Servicer supervises, monitors, and oversees all Servicers servicing loans in the Trusts.[9]

While Plaintiff focuses solely on one of the Master Servicers, *at least 14 different entities actually serviced loans in the Trusts*:  Banco Popular de Purto Rico, Bank of America, N.A., Cenlar, FSB, CitiMortgage, Inc., Colonial Savings, FA, Countrywide Home Loans, Inc., HSBC Mortgage Corporation, National City, Select Portfolio Servicing, Inc., SunTrust Mortgage, Inc., Wachovia Mortgage Corporation, Washington Mutual Bank, Washington Mutual Mortgage Securities Corp., and Wells Fargo Bank, N.A.  MALT PSA, Art. I; CSMC PSA, Art. I. None of the Servicers is a defendant in this action.

1.   The RMBS Trustee Is Not Involved in,
and Is Not Responsible for, Servicing

Under the PSAs, U.S. Bank is not responsible for servicing or foreclosing on loans.  Foreclosure actions, even when brought in the RMBS Trustee's name, are brought by Servicers (or Master Servicers), not the Trustee.  ¶ 21.[10]

---

[8]  Talcott J. Franklin and Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook ("T. Franklin ABS Handbook"), §1:8; Complaint at ¶ 16 ("As the Master Servicer is ultimately responsible for the servicing . . . .")
[9]   MALT PSA, § 3.01; *see also* CSMC PSA § 3.01.
[10]  For this reason, Plaintiff's allegation, citing *U.S. Bank Nat'l Assoc. v. Ibanez*, 941 N.E.2d 40 (Mass. 2011), that "U.S. Bank, itself has engaged in filing flawed

-7-

The PSAs also provide that the RMBS Trustee has no responsibility for monitoring Servicers' performance and expressly exculpates the RMBS Trustee from liability for errors or omissions by the Servicer:

- "Neither the Trustee nor the Depositor shall have any responsibility or liability for any action or failure to act by the Master Servicer or any Servicer nor shall the Trustee or the Depositor be obligated to supervise the performance of the Master Servicer hereunder or any Servicer under any Servicing Agreement or otherwise." MALT PSA, § 3.04.

- "The Trustee shall not be accountable, shall have no liability and makes no representation as to any acts or omissions hereunder of the Master Servicer . . . ." MALT PSA, § 8.01(iv).[11]

Instead, the Master Servicer, Trust Administrator,[12] and each Servicer annually certify their compliance with applicable agreements and servicing criteria. MALT PSA, § 3.22(a); CSMC PSA, § 13.07. Unless directed by Certificateholders to investigate, the RMBS Trustee and Trust Administrator are expected to rely upon such certifications,[13] and, per the MALT PSA, "shall not be responsible for the

---

and misleading documents relating to foreclosures," ¶ 85, is misleading. The purportedly ineffective mortgage assignment in *Ibanez* was signed by the servicer under the applicable PSA, not by U.S. Bank. 941 N.E.2d at 46-48.

[11] The RMBS Trustee cannot be held liable for the actions of the Master Servicer or servicers because the CSMC PSA specifically identifies the Master Servicer and servicers as "independent contractors of the [RMBS] Trustee." CSMC PSA, § 3.01. It is black-letter law that an entity cannot be held liable for the actions or inactions of its independent contractors. *O'Keefe v. Sprout Bauer, Inc.*, 970 F.2d 1244, 1250 (3d Cir. 1992); *Chaouni v. Ali*, 963 N.Y.S.2d 27, 28 (First Dep't 2013).

[12] The Trust Administrator performs ministerial duties, such as calculating monthly payments to certificateholders; preparing monthly distribution reports to certificateholders; and preparing SEC and tax filings on behalf of the Trusts. CSMC PSA, §§ 4.01, 10.12; MALT PSA, §§ 4.02, 9.01, 9.12.

[13] CSMC PSA, § 9.02(a)(i) and MALT PSA, § 8.02(i).

-8-

accuracy or content of any such resolution, certificate, statement, opinion, report, document, order or other instrument," § 8.01, and, under the CSMC PSA, "have no duty to recompute, recalculate or verify the accuracy of any resolution, certificate, statement, opinion, report, document, order or other instrument . . . ."  § 9.01.

The complete absence of a role for the RMBS Trustee in connection with servicing cannot be overstated in this case, as it highlights a fatal flaw in Plaintiff's theory, which attempts to hold U.S. Bank liable for alleged servicing misconduct.

**C.   The RMBS Trustee**

The following explains the limited role of the RMBS Trustee.

1.   The Role of an RMBS Trustee

The label "trustee" often leads to a misperception about the role of an RMBS Trustee or other "indenture trustee, which has been long recognized and which is a reality of modern commercial finance."  *AMBAC Indemnity Corp. v. Bankers Trust Co.,* 573 N.Y.S.2d 204, 207 (N.Y. Sup. Ct. 1991).[14]  An indenture trustee is a "different legal animal," *Peak Partners, L.P. v. Republic Bank*, 191 F. App'x 118, 122 (3d Cir. 2006), and "has very little in common with the ordinary trustee."  *AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 896 N.E.2d 61, 66-67 (N.Y. 2008).  The Second Circuit has explained the distinction:

---

[14]  "Indenture trustee" is the term for a trustee named under an agreement under which securities are outstanding or issued.  *See* 15 U.S.C. § 77ccc.  The Trusts are governed by New York law.  CSMC PSA, § 12.03; MALT PSA, § 11.03.

> Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).[15]

Absent an Event of Default ("EOD") (which did not occur here, as explained *infra* at III.D.1), indenture trustees *do not* owe a fiduciary duty to investors.  The duties of a trustee under an indenture are defined "not by the fiduciary relationship, but exclusively by the terms of the agreement."  *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 896 N.E.2d 61, 66 (N.Y. 2008) (quotations omitted).[16]  That indenture trustees' duties are limited to those expressly set forth in the PSA is recognized by law and set forth in the PSAs.  *See* CSMC PSA, §9.01 ("The Trustee . . . undertakes with respect to the Trust Fund to perform such duties *and only such duties* as are specifically set forth in this Agreement." (emphasis added)); MALT PSA, § 8.01.

---

[15] *See also In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, Nos. H-01-3624 & 03-5808, 2008 WL 744823, at *8 n.22 (S.D. Tex. Mar. 19, 2008) (prior to an Event of Default, an indenture trustee has virtually no obligations to investors).

[16] *See also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011) ("[M]uch of the common law of trusts, and its corresponding fiduciary obligations, are not applicable to commercial trusts. Rather the duties of an indenture trustee are generally 'strictly defined and limited to the terms of the indenture.'" (quoting *Elliott*, 838 F.2d at 71).); *Magten Asset Mgmt. Co. v. Bank of N.Y.*, No. 600410/10, 2007 WL 1326795, at *6 (N.Y. Sup. Ct. May 8, 2007) ("Given the relationship the indenture trustee has with both the securities issuers and holders, courts have 'consistently rejected the imposition of additional duties on the [indenture] trustee.'") (quoting *Elliott*, 838 F.2d at 71).

Plaintiff asserts that the RMBS Trustee also can be charged with duties under the Trust Indenture Act (the "TIA").  ¶¶ 131-32.  U.S. Bank disagrees that the TIA applies to certificates of the Trust but is not raising the argument at this time.  Rather, U.S. Bank preserves its arguments as to why the TIA does not apply to the Trusts until the Court can address the issue with the benefit of evidence not available at this stage and with guidance from the Second Circuit, which is currently considering the issue of whether the TIA applies to PSA certificates.  *See Retirement Bd. v. The Bank of New York Mellon*, No. 13-661 (2d Cir.).  Even if the TIA applies, however, the PSA provisions and common law described above are consistent with Section 315(a)(1) of the TIA that "prior to default . . . the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture."  15 U.S.C. §77ooo(a)(1).  "New York state and federal case law are consistent" with this provision of the TIA.  *AG Capital Funding Partners*, 896 N.E.2d at 66-67 (prior to default "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture.").  No EOD occurred in either of the Trusts.  *See infra* at III.D.1.

    2.    U.S. Bank Has No Pre-Default Duty to Investigate
          <u>Unless Properly Directed To Do So By Certificateholders</u>

Although the RMBS Trustee performs only the ministerial duties set forth in the PSAs, Certificateholders may direct the RMBS Trustee to perform additional services if they have sufficient ownership of the Trust and pay the RMBS Trustee

for those services, directly or from Trust assets. The PSAs expressly provide that, absent direction from Certificateholders evidencing percentage interests of at least 25% of the Trusts or the occurrence of an EOD, the Trustee has no duty to investigate. CSMC PSA, § 9.02(a)(v); MALT PSA, 8.02(iv).

This bargained-for allocation of duties was intentionally calibrated to meet the needs and settle the expectations of the deal parties and Certificateholders. Investigations can be expensive, and the only funds available for such investigations would be provided directly by Certificateholders or are Trust assets that belong to the Certificateholders. The RMBS Trustee, as a low-paid service provider, is not required under the PSAs to expend its own funds.[17] The "no-duty to investigate" provision protects Certificateholders by ensuring that a significant percentage of Certificateholders support an investigation to avoid the RMBS Trustee incurring considerable expenses *sua sponte* or at the direction of a small Certificateholder. It also stops the RMBS Trustee from having to guess when Certificateholders want it to investigate, and prevents Certificateholders from second-guessing decisions to investigate or not. The PSAs provide a bright-line test and exculpate the RMBS Trustee for investigating or following directions given by authorized certificateholders.[18]

---

[17] CSMC PSA, § 9.01(4). *See also* MALT PSA, § 8.02(vi).
[18] MALT PSA, § 8.01(iii); CSMC PSA, § 9.01(3).

## III.   ARGUMENT

Plaintiff's claims are based on a theory that it suffered losses because U.S. Bank breached a purported obligation to stop alleged robo-signing by Servicers or failed to uncover and remedy breaches by Sellers.  These theories are flawed in concept and presentation.  As a threshold matter, the Court need not reach the substance of the allegations because Plaintiff did not comply with conditions precedent to bring this lawsuit, and therefore the claims must be dismissed.  Even if Plaintiff had complied, it did not meet the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) to present well-pled factual allegations and plausible claims.[19]

### A.   The "No-Action" Clause Bars Claims Against U.S. Bank

Plaintiff's claims should be dismissed because Plaintiff failed to comply with mandatory conditions precedent before filing this action.

The "no-action" clause in the PSAs bars all litigation by a certificateholder "by virtue or by availing [itself] of" the PSAs unless: (i) the certificateholder gave

---

[19] In evaluating a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must:  (1) "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth;" and (2) if "there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  A complaint first must contain factual allegations and cannot merely contain "naked assertions" lacking any "further factual enhancement."  *Id.* at 678.  A court need not accept as true legal conclusions.  *Id.*  The alleged facts must support a claim that is plausible, not merely possible.  *Twombly*, 550 U.S. at 557.

written notice to a specified notice party (the "Notice Party") of an EOD;[20] (ii)

holders of 25% of the voting rights of the certificates sent a written request to the

Notice Party to institute such action and offered reasonable indemnity to the Notice

Party; and (iii) a specified number of days passed from the written notice, demand,

and indemnity offer during which the Notice Party neglected or refused to initiate

litigation.  *See* CSMC PSA, § 12.07; MALT PSA, § 11.08.

Courts "strictly construe" no-action clauses and hold that no-action clauses

broadly apply to "*any* suit or proceeding in equity or at law upon or under or with

respect to [the PSAs]," not just breach of contract claims.  *Sterling Fed. Bank,*

*F.S.B. v. DLJ Mortg. Capital, Inc.*, No. 09-C-6904, 2010 WL 3324705, at *4 (N.D.

Ill. Aug. 20, 2010) (alterations in original); *see also Cruden v. Bank of New York*,

957 F.2d 961, 968 (2d Cir. 1992).  All of Plaintiff's claims arise "by virtue or by

availing itself of" the PSAs, yet Plaintiff does not plead that it has satisfied the

requisite conditions precedent for filing this lawsuit, as it does not allege, among

other conditions, that it made demand before initiating this litigation.

The lone exception to enforcement of a no-action clause occurs with respect

to claims against the Notice Party itself because it would be "absurd" to demand

that the Notice Party sue itself.  *Cruden*, 957 F.2d at 968.  Here, that lone exception

---

[20] The CSMC PSA specifies notice to the Trust Administrator, § 12.06, while the
MALT PSA specifies notice to the Trustee *or* the Trust Administrator, § 11.08.
The MALT PSA uses the term "Master Servicer Event of Termination" to refer to
what most PSAs refer to as Events of Default.

does not apply because the PSAs identified Notice Parties other than U.S. Bank. See CSMC PSA, § 12.07 (the Trust Administrator, Wells Fargo, is the sole Notice Party); MALT PSA, § 11.08 (the RMBS Trustee *and* the Trust Administrator, Wells Fargo, are Notice Parties).

Thus, for both Trusts, Certificateholders can make demand on the Trust Administrator to sue U.S. Bank, and the no-action clauses bar Plaintiff's claims because there is nothing "absurd" about Certificateholders demanding this. Courts recognize the "important difference between asking the trustee to sue itself—an 'absurd' requirement that we presume the parties did not intend—and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee." *Sterling Fed. Bank F.S.B. v. The Bank of New York Mellon*, No. 09 C 6904, 2012 WL 3101699, at *2 (N.D. Ill. July 30, 2012) (quoting *Sterling*, 2010 WL 3324705 at *5).[21] In *Sterling*, the court addressed the identical issue, namely whether claims pled against an RMBS trustee are barred when the Trust Administrator is a Notice Party under the no-action clause. The Court held that the no-action clause barred the claims against the RMBS trustee. *Sterling*, 2012 WL 3101699 at *2.

No-action clauses are enforced, among other reasons, "to avoid a

---

[21]   Some reported decisions stating that the demand requirement is excused for claims against "the trustee" involve indenture agreements in which the trustee is the only notice party and cannot be expected to sue itself. That logic does not apply where the Trust Administer is a notice party. Trustees are not "categorically exempt from no-action clauses." *Sterling*, 2012 WL 3101699 at *3-4.

-15-

multiplicity of lawsuits." *Bankers Ins. Co. v. DLJ Mortgage Capital, Inc.*, No. 8:10-cv-0419-T-27EAJ, 2011 WL 2470226, at *2 (M.D. Fla. Mar. 17, 2011) (Report and Recommendation) (citing *Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1289 n.9 (11th Cir. 2004)) *adopted in all respects by* 2011 WL 2470615 (M.D.Fla. June 21, 2011).  It is noteworthy that U.S. Bank was sued earlier this year in a different jurisdiction involving a nearly verbatim complaint that asserted claims involving RMBS trusts, including one of the Trusts.  *See* Complaint, *Commerce Bank v. U.S. Bank Nat'l Ass'n*, No. 4:13-cv-00517, ECF No. 1-2 (W.D. Mo. May 9, 2013), attached as Ex. D to the Rademacher Cert.  As such, this case represents precisely the type of litigation that the "no-action" clauses were intended to prevent.

### B.    Plaintiff's "Robo-signing" Theory Is Not Supported by Factual Allegations or the PSAs, and Is Implausible

Plaintiff fails to state a claim against the RMBS Trustee relating to Servicer conduct because it fails to adequately allege that:  (i) such conduct occurred with respect to the Trusts; (ii) if so, that the RMBS Trustee knew about it (iii) that the RMBS Trustee had a duty to take action that it failed to take; and (iv) the RMBS Trustee's acts or omissions caused Plaintiff's alleged losses.

### 1.    Plaintiff Pleads General Allegations of Servicer Robo-Signing, Not that Robo-Signing Actually Occurred in Connection with a Single Loan in the Trusts

Plaintiff does not plead that robo-signing actually occurred in connection

-16-

with the Trusts or how that robo-signing caused its losses. While Plaintiff points to regulatory investigations and settlements by several mortgage Servicers, the Complaint does not allege that a single document in a foreclosure involving either of the Trusts in which Plaintiff invested was robo-signed, that U.S. Bank was aware that any such document was robo-signed, or that robo-signing of a particular document led to a single dollar of loss to Trust investors. None.

Instead, the Complaint sets forth a general critique of the mortgage servicing industry and an account of regulatory settlements by a small percentage of the Servicers of the Trusts. Such generalities are insufficient to withstand a motion to dismiss. Numerous courts have rejected similar attempts by plaintiffs to rely on conclusory allegations of robo-signing based on general information unhinged to the loans or trusts at issue. For example, in *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516 (10th Cir. 2013), the plaintiff-borrowers asserted a claim for wrongful foreclosure based on the allegation that the endorsement of their note was robosigned. The Tenth Circuit held that such bald and conclusory allegations were insufficient because the plaintiffs failed to allege any facts indicating that the endorsement on *their* note was robo-signed:

> [The complaint] does not explain what "robo-signing" is or why it renders the endorsements fraudulent, let alone include factual content indicating that it occurred in this case. Numerous courts have held that bald allegations of "robo-signing" do not suffice under the Rule 8(a)(2) standard set by *Iqbal*.

-17-

*Toone*, 716 F.3d at 521 (collecting cases).[22]

Similarly, in *Butler v. Wells Fargo Bank, N.A.*, No. MJG–12–2705, 2013 WL 145886 (D. Md. Jan. 11, 2013), the court dismissed claims against a bank based on media reports of robo-signing, holding that such allegations "provide a quintessential example of the type of formulaic recitation that is manifestly inadequate to present a plausible claim." *Butler*, 2013 WL 145886, at *3. Numerous courts have agreed.[23]

This failure to link robo-signing with the Trusts is exacerbated here by the fact that the Complaint focuses largely on purported robo-signing *by Wells Fargo*.

---

[22] *Cf. Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 169-70 (2d Cir. 2005) (in securities fraud context, notice could not be triggered by generalized reports that did not asserts facts regarding the specific security in question).

[23] *See*, *e.g.*, *Madlaing v. JPMorgan Chase Bank, N.A.*, No. CV F 12-2069(LJO), 2013 WL 2403379 (E.D. Cal. May 31, 2013) (dismissing vague and conclusory allegations of robo-signing as inadequate); *Cerecedes v. U.S. Bankcorp,* No. CV 11-219(CAS), 2011 WL 1666938, at *4 (C.D. Cal. Apr. 29, 2011); *Crawford v. Countrywide Home Loans, Inc.,* 647 F.3d 642, 645 (7th Cir. 2011); *Nottage v. Bank of N.Y. Mellon*, No. 12–00418 JMS, 2012 WL 5305506, at *6 (D. Haw. Oct. 25, 2012); *Macawile v. Pro30 Funding*, No. 2:12–CV–00567–MCE–DAD, 2012 WL 2912349, at *2 (E.D.Cal. July 16, 2012); *Islamic Ass'n of DeSoto, Texas, Inc. v. Mortg. Elec. Registration Sys., Inc.*, No. 3:12–CV–0613–D, 2012 WL 2196040, at *3 (N.D. Tex. June 15, 2012); *Block v. BAC Home Loans Servicing LP*, No. 11–11181, 2012 WL 2031640, at *4 (E.D. Mich. June 6, 2012); *James v. ReconTrust Co.*, 845 F. Supp. 2d 1145, 1169 (D. Or. 2012); *Sembly v. U.S. Bank Nat'l Ass'n.*, No. 11-12322, 2012 WL 32737, at *3 (E.D. Mich. Jan. 6, 2012); *Mickelson v. Chase Home Fin. LLC*, No. C11–1445 MJP, 2011 WL 5553821, at *3 (W.D. Wash. Nov. 14, 2011); *Peterson v. GMAC Mortg., LLC*, No. 11–11115–RWZ, 2011 WL 5075613, at *5 (D. Mass. Oct. 25, 2011); *Schultz v. BAC Home Loans Servicing, LP,* No. CV–11–00558–PHX–NVW, 2011 WL 3684481, at *2 (D. Ariz. Aug. 23, 2011); *Orzoff v. Bank of Am., N.A.*, 2:10-cv-2202(JCM), 2011 WL 1539897, at *3 (D. Nev. Apr. 22, 2011).

-18-

Wells Fargo served as one of the Master Servicers of the Trusts, but more than a dozen different Servicers actually serviced loans in the Trusts. Most of those Servicers—the entities that sign documents in foreclosures—are not even mentioned in the Complaint, much less accused of robo-signing.

        2.    The Complaint Fails to Adequately Plead that U.S. Bank Had <u>Knowledge of Alleged Robo-Signing By Servicers</u>

Even if Plaintiff had established that robo-signing by the Servicers for the Trusts actually occurred, Plaintiff failed to establish that U.S. Bank had knowledge of such robo-signing. Instead, Plaintiff claims that U.S. Bank "was imputed with the knowledge" of Servicers' robo-signing "by at least October 19, 2011", ¶ 123, although Plaintiff does not explain the significance of this date. Even then, Plaintiff only alleges that U.S. Bank was aware of "likely" breaches, ¶ 3, conceding that U.S. Bank did not have *actual* knowledge of *actual* breaches, as is the standard under the PSAs. *See* CSMC PSA, § 9.01(1); MALT PSA, § 8.02(viii).

Plaintiff's theory of liability does not hold water. Plaintiff goes on at length in the Complaint describing government investigations and settlements that were announced in April 2011. ¶¶ 81-82, 86, 91-103. The settlements came during and after six- month investigations by a 50-state Mortgage Foreclosure Multistate Group and the federal government, including a Congressional Oversight Panel, the FRB, the OCC, the Office of the Inspector General, and U.S. Departments of

-19-

Housing and Urban Development, Justice, and Treasury.  ¶¶ 77, 78, 81-82, 98-99.

Even if U.S. Bank had a basis to investigate Servicer robo-signing when the issue

first surfaced in the media, it was never directed to do so by at least 25% of Trust

Certificateholders, which is critical.  The RMBS Trustee would put itself at risk of

liability if, on its own, the RMBS Trustee decided to spend Trust assets to conduct

an expensive investigation into robo-signing that duplicated the comprehensive

efforts of the legion federal and state regulators that, unlike the RMBS Trustee, are

armed with subpoena power and the threat of government action.[24]

The resulting settlements[25] publicized government findings resulting from

extensive investigations of Servicer document execution practices described above,

and specifically required the affected Servicers to fix those practices and identify

and remediate past flaws.  Plaintiff asserts that New Jersey courts analyzed Wells

Fargo's compliance with foreclosure requirements, and Plaintiff concedes that

Wells Fargo was permitted to resume foreclosures on August 5, 2011, months

---

[24] Sophisticated investors, including Plaintiff, undoubtedly were aware of media
coverage beginning in the fall of 2010 concerning alleged robo-signing and could
have directed U.S. Bank to investigate but opted not to do so.  Certificateholders
may have recognized that regulators already were conducting investigations and
therefore there was no need to duplicate those efforts using trust assets.  Regardless
of the reason, it is not the RMBS Trustee's job to second-guess investors'
decisions about the prudent use of trust assets.
[25] The settlements are publicly available:
http://federalreserve.gov/newsevents/press /enforcement/ 20110413a.htm, and
http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.

before U.S. Bank purportedly was imputed with knowledge of robo-signing.[26]

Plaintiff fails to identify what was left for U.S. Bank to investigate and stop once these remediation programs were in place, six months *before* U.S. Bank was allegedly imputed with knowledge of the "robo-signing."  In other words, Plaintiff does not allege plausibly how it was harmed by U.S. Bank's "failure" to act on a problem identified and remedied by myriad state and federal regulators.

### 3.    U.S. Bank Had No Duty to Police Alleged Servicer Misconduct

Plaintiff's vague allegations that the RMBS Trustee had contractual duties to act, ¶ 145, are belied by Plaintiff's failure to cite any such duties and by the express terms of the PSA.

As demonstrated in Section II.C, *supra*, the RMBS Trustee's duties are limited to those expressly stated in the PSAs.  Of particular relevance here, the PSAs expressly state that:  (i) the RMBS Trustee shall not "have any responsibility or liability for any action or failure to act by the Master Servicer or any Servicer" nor shall it "be obligated to supervise the performance of the Master Servicer hereunder or any Servicer under any Servicing Agreement or otherwise."  MALT PSA, § 3.04.  The PSAs further require that the Servicer and/or Master Servicer certify to compliance with applicable servicing requirements and standards, and the RMBS Trustee has no duty to verify the contents of those certifications.  MALT

---

[26] ¶ 107, n.32; ¶ 123.

PSA, §§ 9.02, 8.01, CSMC PSA, §§ 8.02, 9.01.[27]  Here, Plaintiff seeks to hold U.S.

Bank liable for acts and omissions of Servicers notwithstanding the fact that the

PSA expressly exculpates U.S. Bank for such liability.

Requiring U.S. Bank, on its own initiative and without direction or payment,

to undertake a detailed review of servicing conduct based on news reports and

other public information—all of which were equally available to Certificateholders

(many of whom, unlike the RMBS Trustee, have fiduciary duties to investigate)—

would rewrite the terms and structure of the PSAs.  Indeed, if, absent

certificateholder direction, a RMBS trustee spent millions of dollars of trust assets

in an effort to rule out the possibility of breaches, the RMBS trustee could be sued

for doing so, and would be at risk of liability in a way that the PSAs intentionally

were drafted to prevent.  This concern is not hypothetical, as counsel for Plaintiff

in another action sued another trustee seeking an accounting of the "costs, charges,

and expenses" for which service providers for RMBS trusts obtained or sought

---

[27]   Plaintiff cites a 2003 Moody's article—rather than the PSAs—to suggest that the RMBS Trustee assumed (or should have assumed) certain duties.  ¶¶ 50-52.  A Moody's article cannot impose extra-contractual obligations, and Plaintiff omits that the same article also stated that, after 2003, "Moody's will take into consideration the trustee's interpretation of their [limited, ministerial] role as evidenced by past performance on behalf of investors."  Claire M. Robinson, *Moody's Re-examines Trustees' Role in ABS and RMBS*, Moody's Investors Service at 7 (Feb. 4, 2003), Rademacher Cert. Ex G.  The Trusts were created in 2006 and 2007 and therefore, according to Moody's own statements, were rated based on the understanding that the RMBS Trustee would play a limited, ministerial role.

reimbursement from the trusts.  *See, e.g., Knights of Columbus v. Bank of N.Y.
Mellon*, No. 651442/2011 (filed N.Y. Sup. Ct. Aug. 16, 2011) (motion to dismiss
and stay pending).

4.    <u>Plaintiff Does Not Plead How Robo-Signing Harmed It</u>

Plaintiff alleges that it has "incurred impairment charges" "all of which are
attributable to losses from the violations alleged in [the] Complaint."  ¶ 127.  This
allegation is both insufficient and implausible.

Plaintiff's parent company's own public filings tell a different story,
acknowledging that the value of its RMBS holdings was affected by "uncertain
domestic political, [and] credit and financial market conditions . . . ."  *See*
Rademacher Cert., Ex. A, at p. 22.  According to Plaintiff's parent, the value of
these securities could be negatively impacted by "the slow recovery in the U.S.
economy and its negative effect on the performance of . . . the underlying mortgage
loan collateral."  *Id.* at p. 23.  Plaintiff's parent company concedes that, even for
the impaired RMBS described in its annual report, "each security is currently
performing in accordance with its contractual obligations."  *Id.* at p. 74.

Moreover, Plaintiff's liability and damages theory cannot be reconciled.
The crux of the Complaint is that:  (a) Servicers robo-signed foreclosure
documents (which possibly *benefited* Certificateholders through accelerated

-23-

foreclosures);[28] (b) the practice was exposed; and (c) new legal requirements have been imposed on foreclosures to prevent robo-signing (through regulatory settlements or otherwise) that have increased the costs of foreclosures. Accordingly, under Plaintiff's theory, U.S. Bank should have stopped robo-signing by Servicers, yet U.S. Bank also should be held responsible for increased costs that ensued once robo-signing was stopped.  That theory cannot pass the plausibility test.

As a separate matter, U.S. Bank cannot be responsible for increased costs associated with new foreclosure laws and requirements designed to prevent alleged servicing misconduct about which Plaintiff complains.  The PSAs make clear that:

> Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.[29]

Plaintiff also pleads a catchall list of other "additional expenses" purportedly caused by robo-signing, such as sanctions, fines, and penalties imposed on Servicers, attorney's fees and costs for re-filing documents, attorneys fees for defense of government investigations, etc.  ¶ 116.  But Plaintiff does not allege that

---

[28] U.S. Bank does not condone any improper conduct by any servicer.  From a damages and loss causation perspective, however, Plaintiff fails to plead how robo-signing itself harmed Certificateholders.

[29] CSMC PSA, § 9.05; MALT PSA, § 8.03 (Trustee not liable for certificates or mortgage loans), § 8.02 ("The Trustee shall have no duty . . . to see to the payment or discharge of any tax, assessment, or other governmental charge . . . .").

any of those costs were actually borne by Certificateholders as opposed to the Servicers who were the subject of regulatory actions.

5.      Plaintiff's Conflict of Interest Theory Is
        Implausible and Does Not Save the Complaint

Plaintiff cannot identify any *duty* for U.S. Bank to investigate robo-signing. Accordingly, it claims that U.S. Bank had *discretion* to prevent Servicer robo-signing but did not exercise that *discretion* because of a conflict of interest, namely that U.S. Bank, acting as a Servicer for unrelated loans, engaged in "the exact same activities".  ¶ 69.  This conflict of interest theory does not withstand scrutiny.

First, while the so-called "discretion" purports to arise "[u]nder each PSA," ¶¶ 82, 89, the PSAs are clear that a discretionary right of the RMBS Trustee *cannot* be construed as a duty.  CSMC PSA, § 9.02(a)(ix) ("[T]he right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty . . . ."); MALT PSA, § 8.01 ("The Trustee . . . shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement."). To state a claim—under a contract or tort theory—Plaintiff must identify a duty that was breached, as no cause of action exists for breach of a discretionary right.

Moreover, the notion that U.S. Bank, as RMBS Trustee, is liable for not launching its own investigation into servicing of the Trusts based on the Servicers' regulatory settlements contradicts the structure of the transactions because an RMBS trustee is not required to investigate unless Certificateholders of the Trusts

-25-

direct it to do so.  MALT PSA, § 8.02(ix); CSMC PSA, § 9.02(a)(v).  As a result,

Plaintiff fails to plead that a conflict of interest prevented U.S. Bank from taking

action that it otherwise would have taken.  It is simply not plausible to infer that,

absent a purported conflict of interest, U.S. Bank would have voluntarily taken

actions (*i.e.* launching Servicer investigations) that are inconsistent with its limited

bargained-for duties.  Courts recognize that an actionable conflict of interest does

not exist if a trustee acts consistently with the terms of the indenture.  *CFIP*

*MasterFund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010)

(rejecting investor's claim that the trustee had an improper conflict of interest

because the trustee acted consistently with the terms of the trust indenture).

Plaintiff's conflict theory is further belied by the fact that Plaintiff does not

plead that *any* RMBS Trustee that did not have U.S. Bank's so-called conflict of

interest took the steps that Plaintiff claims that U.S. Bank should have taken.

Plaintiff's inability to point to the contrary actions of even one trustee casts doubt

on its theory that U.S. Bank did not act as a prudent person would have acted under

the circumstances.  As a result, the inference advocated by Plaintiff—that U.S.

Bank did not police robo-signing because it had a "conflict"— fails to cross the

*Twombly-Iqbal* plausibility threshold.

In the cases in which courts have found conflicts by indenture trustees, the

trustee directly acted to prioritize its own pecuniary position over trust

-26-

beneficiaries, *i.e.*, "where the indenture trustee is a general creditor of the obligor, who is in turn in financial straits." *E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank*, 953 F.2d 963, 972 (5th Cir. 1992).  No such conflict is alleged here.

In contrast, courts routinely dismiss conflict claims against indenture trustees where, as here, the plaintiff asserts only a hypothetical conflict, or the security holder fails to demonstrate that the trustee actually took action that financially disadvantaged the security holder while advancing its own financial interests.  *See id.* at 972 ("A mere hypothetical possibility" that an indenture trustee would allow its personal financial interest in other unrelated matters to sway its actions "does not suffice" to state a claim).[30]  For example, in *Ellington*, the court rejected RMBS trust certificateholders' argument that the trustee had an improper conflict of interest because, rather than terminating the servicer upon learning of alleged servicer misconduct, the trustee allegedly secured a release for itself.  837 F. Supp. 2d at 187.  The court reasoned that "Plaintiffs make no particularized allegations that [the trustee] financially benefitted from its decision not to

---

[30]  *See also Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 73 (2d Cir. 1988) (trustee had no conflict because no evidence of direct or indirect financial benefit to the trustee from its actions); *CFIP*, 738 F. Supp. 2d at 475 (trustee had no conflict of interest that affected its actions based on revenues from other transactions with same parties which are "infinitesimal in comparison with the overall revenues of these financial institutions"); *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 CIV 6907, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000) (trustee has no conflict of interest based on its interest in "continu[ing] to receive lucrative trustee work").

terminate [the servicer] or otherwise conspired with [the servicer] to defraud the trusts, which are the classic hallmarks of a conflict of interest." *Id.*

Here, Plaintiff does not allege how U.S. Bank financially benefited by not investigating robo-signing or why, given its limited duties, it would have done so absent a direction from Certificateholders.  Plaintiff offers nothing more than unfounded theoretical motives, which are insufficient.

### C.    Plaintiff Fails to Establish that the Trustee Improperly Failed to Compel the Sellers to Repurchase Loans

Although the bulk of the Complaint focuses on servicing conduct, it also includes allegations that Sellers that sold the mortgage loans to the Trusts breached representations and warranties in loan-level disclosures made by the Sellers concerning the characteristics of the loans and borrowers.  *See* ¶¶ 53-65, 131-32. Plaintiff appears to claim that, had the RMBS Trustee taken some action, the Sellers would have been obligated to repurchase the loans from the Trusts and/or substitute in other loans.  According to Plaintiff, the RMBS Trustee had a duty to notify Certificateholders of any breaches, "had no good faith reason for failing to provide notice of those defaults," and should have taken any number of steps such to as "su[ing the Seller] to require the repurchase [by the Sellers] of loans that breached their representations and warranties."  ¶¶ 131-32.

Like the servicing claims, these misrepresentation allegations are pled with woefully inadequate detail.  Plaintiff tellingly hedges its bets as to whether any

Seller even breached a representation and warranty in the first place, claiming only that "Defendant is aware of *likely* breaches of representations and warranties . . . ." ¶ 3. In fact, Plaintiff does not identify a single loan in either of the Trusts about which a representation and warranty was actually breached, much less allege damages arising from the breach of the representation or warranty.

Moreover, as set forth above, the RMBS Trustee is entitled to rely on the representations and warranties of the Seller. It has no independent duty to investigate the veracity of those representations and warranties and is not expected to do so without written direction from the requisite percentage of Certificateholders. The RMBS Trustee received no such directions here.

RMBS investors themselves publicly have rejected the notion that trustees have a duty to investigate possible breaches of representations and warranties. For example, the Association of Mortgage Investors—"the primary trade association representing investors in mortgage-backed securities, including public pension funds, unions, university endowments, and private retirement systems"—argued that "*before an event of default takes place, trustees are under no obligation to determine whether a loan is in breach of representations and warranties.*"[31]

In lieu of any specifics about the loans in these Trusts or U.S. Bank's actual

---

[31] Declaration of Demian A. Ordway in Support of Motion for Leave to File Brief as Amicus Curiae, Ex. A at iv, 10, *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (HB) (S.D.N.Y. Dec. 13, 2012), ECF No. 38-1 (emphasis added).

awareness of a breach of a representation of warranty concerning a single loan in these Trusts, Plaintiff again turns to public allegations about the mortgage industry. For example, Plaintiff alleges that Countrywide Home Loans, Inc. originated some loans in the Trusts, and that the Federal Trade Commission filed a complaint in June 2010 alleging that "[m]any of the loans [at issue in that lawsuit]. . .  are risky, high-cost loans . . . ."  ¶ 55.  But the FTC lawsuit had nothing to do with the loans in the Trusts, the FTC did not assert any claims concerning loan-level representations and warranties, and the lawsuit was terminated one week after it was filed without any admissions by Countrywide.  *See* Complaint at ¶¶ 23-35, *FTC v. Countrywide Home Loans, Inc.*, No. 10-CV-4193, ECF No. 1 (C.D. Cal. June 7, 2010).  There is no allegation that Certificateholders, upon reading the FTC complaint, requested that U.S. Bank investigate.

With respect to the CSMC Trust, Plaintiff cites an analysis purportedly performed by Allstate Insurance Company ("Allstate"), ¶¶ 56-61, but does not allege that Allstate shared its analysis with the RMBS Trustee or, if so, when. Instead, Plaintiff merely says that "U.S. Bank knew or should have known of Allstate's findings" but offers no further explanation because Plaintiff knows that Allstate opted to sue the Seller and several affiliates directly rather than notifying the RMBS Trustee of alleged breaches and directing the RMBS Trustee to take action.  *See* Complaint, *Allstate Insurance Company v. Credit Suisse Securities*

-30-

*(USA) LLC,* No. 650547/2011 (N.Y. Sup. Ct. Feb. 28, 2011), ECF No. 1 (the

"*Allstate* Complaint"), Rademacher Cert., Ex. F.[32]  Plaintiff does not even allege

that Allstate notified the RMBS Trustee which loans Allstate believed should have

been repurchased, which would have enabled the RMBS Trustee to provide notice

to the Seller of which loans would be subject to repurchase.  What's more,

Plaintiff's naked allegation that the RMBS Trustee had a duty to enforce the

Seller's obligation to "cure, substitute, or repurchase mortgage loans that breach

applicable representations and warranties," ¶ 41, is demonstrably false.  The

CSMC PSA states that the RMBS Trustee only has the duties expressly set forth in

that PSA and that no other duties can be implied.  CSMC PSA, § 9.01.  *Nowhere*

*does the PSA provide that the RMBS Trustee is charged with enforcing breaches of*

*representations and warranties.*

*       *       *

As with its similar servicing theory, Plaintiff's representation and warranty

theory fails to state a plausible claim.  Among other failures described above,

Plaintiff failed to identify any basis to support a theory that U.S. Bank had notice

---

[32] It is noteworthy that, in that litigation, Allstate has not blamed the RMBS Trustee for any of its losses.  Moreover, Plaintiff fails to disclose that Allstate and Plaintiff invested in different loan groups, and therefore completely different loans, within the CSMC 2006-8 Trust; the Complaint is silent as to whether Allstate's purported investigation is even relevant to Plaintiff's losses**.**  *See* ¶ 22; CSMC 2006-8 Prospectus Supplement, dated at September 29, 2006 ("CSMC Pro. Supp."), at p. S-12, S-55, attached to the Rademacher Cert. as Ex. E; *Allstate* Complaint, at ¶ 3.

of any breaches of any of the loans in the MALT 2007-1 Trust.  With respect to the other Trust (CSMC 2006-8), the RMBS Trustee had no duty to enforce breaches and therefore could not have breached such a duty.

### D.    Each of Plaintiff's Seven Counts Fails

The Complaint fails because Plaintiff failed to comply with the no-action clause, the allegations are inadequately pled and the theories are implausible.  The Complaint also fails for the additional claim-specific reasons set forth below.

### 1.    The TIA Claim Fails Because Plaintiff Did Not Allege an EOD

If this litigation proceeds, U.S. Bank will demonstrate that the TIA is inapplicable to these Trusts or this lawsuit.  But Plaintiff's TIA claims should be dismissed without reaching that question because the duties purportedly breached only attach after the occurrence of an EOD, which did not happen.

Under the TIA, a trustee is obligated to:  (i) exercise after the occurrence of a default "the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would;" and (ii) provide "notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  *See* 15 U.S.C.A. § 77ooo(b)-(c).[33]  Under Section 315, the term "default" is defined by the indenture.  *Id.* at 77ooo (a) and (c) (providing that "default" is

_____

[33] Although Plaintiff alleges in the Complaint that the RMBS Trustee has a duty under the TIA to give notice of "breaches," ¶ 131, that is verifiably false, as the TIA only requires trustees to give notice of "defaults."  15 U.S.C.A. § 77ooo(b).

defined as "such term is defined in such indenture"); *see also* Am. Bar Found.,
Commentaries on Model Debenture Indenture Provisions 249 (1986) ("[T]he TIA
leaves the definition of 'default' to the discretion of the draftsman.").

The PSAs for the Trusts each contain a section entitled "Default." *See*
MALT PSA, Art. VII; CSMC PSA, Art. VIII. Those sections make clear that
default means an EOD, and then specifically enumerate what constitutes an EOD,
which is consistent with industry practice. *See* Am. Bar Found., Commentaries on
Model Debenture Indenture Provisions 249 (1986) ("Most lawyers define 'default'
as an 'Event of Default' and the Securities and Exchange Commission has
qualified under the TIA without objection all indentures containing this definition
of 'default.'"). Under the PSAs, only specifically enumerated actions by the
master servicer (for MALT 2007-1) or the master servicer and servicers (for
CSMC 2006-8) could ever create an EOD. *See* MALT PSA, § 7.01; CSMC PSA,
§ 8.01.[34] Given this definition, Plaintiff could only state a claim under Section 315
of the TIA if it alleged adequately that U.S. Bank failed to: (i) act as a prudent
person would have acted following an EOD, and/or (ii) notify certificateholders of

---

[34] The majority of these events relate to occurrences like the liquidation of the
Master Servicer, or the failure to make certain payments that are not alleged here.
*See, e.g.*, CSMC PSA, § 8.01(d) (appointment of liquidator in any insolvency is an
EOD); MALT PSA, § 7.01(iv) (same). These events do *not* include "failure of the
Seller and Depositor to cure defects in the mortgage files and/or to substitute
conforming loans for the defective loans in the Trusts," and Plaintiff's allegations
to that effect in ¶ 131 do not support a claim for breach of the TIA.

all known EODs.  Plaintiff's TIA claim fails because Plaintiff does not specify

which enumerated provision in the PSAs—or even what conduct—led to an EOD.

Moreover, even if Plaintiff had alleged a "default" under the TIA, Section

315(b) only requires the Trustee to provide notice where the default is "known to

the trustee."  15 U.S.C. § 77ooo(b).  Plaintiff did not allege the RMBS Trustee's

*actual* knowledge, which is the standard set forth in the PSAs and, if applicable,

the TIA, which adopts the pre-Event-of-Default duties of the PSAs.  *See* CSMC

PSA, § 9.01; MALT PSA, § 8.01(viii); *Baker v. Summit Bank*, 46 F. App'x. 689,

690 (3d Cir. 2002).  Instead, Plaintiff relies solely on "imputed" knowledge of

"likely" breaches, ¶¶ 3, 123, 138, 146, which cannot trigger a duty to provide

notice.  The CSMC PSA provides that:

> The Trustee shall not be deemed to have knowledge of any Event of
> Default or event which, with notice or lapse of time, or both, would
> become an Event of Default, unless a Responsible Officer of the Trustee
> shall have received written notice thereof from a Servicer, the Depositor,
> or a Certificateholder, or a Responsible Officer of the Trustee has actual
> notice thereof, and in the absence of such notice no provision hereof
> requiring the taking of any action or the assumption of any duties or
> responsibility by the Trustee following the occurrence of any Event of
> Default or event which, with notice or lapse of time or both, would
> become an Event of Default, shall be effective as to the Trustee.

CSMC PSA, § 9.01; *see also* MALT PSA, § 8.02(viii).

Taken together, Plaintiffs do not come close to pleading that an EOD

occurred and therefore fail to plead a violation of the TIA.  U.S. Bank could not

have breached the TIA by failing to alert certificateholders of "defaults" that never

-34-

occurred (and/or about which it did not receive proper notice) and failing to perform duties that it never assumed.

### 2.   The Breach of Contract Claim Is Unintelligible

Count IV is premised on a purported breach of contract, yet Plaintiff fails to reference even a single purportedly breached provision in the PSAs, which alone warrants dismissal.  Rather, Plaintiff claims that U.S. Bank did not "hold the loans for the benefit of Certificateholders"—a statement directly contradicted earlier in the Complaint where Plaintiff alleges the exact opposite.  *Compare* ¶ 21 and ¶ 136 with ¶ 152.  Plaintiff offers no clue as to how alleged servicer robo-signing could be tied to a purported failure to hold loans for the Certificateholders.  Plaintiff's cryptic allegation that "certain" unidentified loans "were held for the benefit of affiliates of the Master Servicer," ¶ 154, is not only unsupported by any allegations in the Complaint but also unintelligible, as no affiliates of the Master Servicers are identified in the Complaint.

### 3.   The Breach of Fiduciary Duty Claim Should Be Dismissed

Plaintiff's third count alleges that U.S. Bank breached a fiduciary duty by failing to stop servicer robo-signing, which fails for all of the reasons set forth above, as well as for two additional reasons.

First, these claims are duplicative of the breach of contract claim in Count IV, in that Plaintiff alleges that, under the PSA, U.S. Bank had a duty to prevent

robo-signing but failed to do so.  *Compare* ¶¶ 150-55 with ¶¶ 142-49.  Under

governing New York law, "[i]n order to sustain a tort action separate from the

breach of contract claim, the tortious conduct must have breached a legal duty

existing independently of the contractual relations between the parties."  *See G.D.*

*Searle & Co. v. Medicorp Commc'ns, Inc.*, 843 F. Supp. 895, 909 (S.D.N.Y.

1994).[35]  "'[A] cause of action for breach of fiduciary duty that is merely

duplicative of a breach of contract claim cannot stand.'"  *Ellington*, 837 F. Supp.

2d at 193 (quoting *Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F.

Supp. 2d 226, 249-50 (S.D.N.Y. 2011)).[36]

　　Second, the N.Y. Court of Appeals held that indenture trustees, such as U.S.

Bank, do not owe a fiduciary duty prior to an EOD, and Plaintiff has not alleged an

EOD.  In *AG Capital Funding Partners*, the Court of Appeals rejected a claim that

an indenture trustee owed fiduciary duties because the plaintiff "cannot point to

any provision in the indentures that places fiduciary obligations on [the Trustee]

prior to an event of default."  896 N.E.2d at 67.  The court distinguished fiduciary

---

[35] *See also OEI v. Citibank, N.A.*, 957 F. Supp. 492, 521 (S.D.N.Y. 1997) (restating contract claim does not provide a basis for claim of aiding and abetting fraud).

[36] *See also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 390 (N.Y. 1987) (dismissing tort claim because "[e]ach of the[] allegations . . . is merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract"); *Metro. W. Asset Mgmt. v. Magnus Funding Ltd.*, No. 03 Civ. 5339(NRB), 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004) (dismissing fiduciary duty claim because it "arises out of the same facts as [the] breach of contract claim . . . .").

duties from a duty to perform ministerial duties with due care and explained that

"mere allegations that a fiduciary duty exists, with nothing more" cannot survive

judicial scrutiny.  *Id.* at 67-68*; see also Ellington*, 837 F. Supp. 2d at 192 (rejecting

attempt to fashion a fiduciary duty from PSA terms).  Applied to the facts here,

Plaintiff fails to identify any provision of the PSA in which the RMBS Trustee

assumed any fiduciary duties, and therefore Claim III should be dismissed.[37]

### 4.   Plaintiff's Duty of Loyalty Claim Should Be Dismissed

Plaintiff's claim for breach of the duty of loyalty (Count II) fails to state a

claim.  It is well-settled law that "in light of the special relationship that the trustee

already has with both the issuer and the debenture holders under the indenture . . . ,

[a]n indenture trustee is not subject to the ordinary trustee's duty of undivided

loyalty" *Elliot*, 838 F.2d at 71 (quoting *Meckel*, 758 F.2d at 816).[38]  Plaintiff bases

its duty of loyalty claims on the purported conflict of interest addressed *supra* at

---

[37] *See Millennium Partners, L.P. v. U.S. Bank Nat'l. Ass'n*, No. 12 Civ. 7581(HB),
2013 WL 1655990, at *4 (S.D.N.Y. Apr. 17, 2013) (dismissing fiduciary duty
claims because plaintiffs did not allege an EOD); *Ellington*, 837 F. Supp. 2d at 192
(trustee's obligation to avoid conflicts of interest did not rise to the level of a
fiduciary duty); *Raymond James & Assocs. v. Bank of N.Y. Trust Co.* No. 8:07-CV-
239-T-27(TBM), 2008 WL 4279629, at *5 (M.D. Fla. Sept. 18, 2008) ("Implying a
duty . . . under the guise of a fiduciary duty is prohibited by the Indentures and
contrary to New York law.").

[38] Courts have recognized for 65 years that indenture trustees have no undivided
loyalties, but rather owe duties to multiple parties, some of which have different
interests.  *See, e.g., In re Prudence-Bonds Corp.*, 76 F. Supp. 643, 646 (E.D.N.Y.
1948) ("Where we have a corporate trustee, the rights involved are not alone the
rights of a bondholder but of all parties to the Trust Agreement.  Thus the Debtor,
the Corporate Trustee and the Bondholders have rights which must be protected.").

III.B.5.  As explained therein, no conflict of interest existed; thus, Count II fails.

### 5.    Count V (Negligence) Is Inadequately Pled

Plaintiff alleges that U.S. Bank negligently breached "a duty to perform its ministerial duties with due care," ¶ 157, by allowing the Master Servicer to sign foreclosure documents.  ¶ 159.

Like the other tort claims, this claim repackages the breach of contract claims and must be dismissed.  "Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim."  *Ellington,* 837 F. Supp. 2d at 203 (dismissing negligence claim that "arises out of conduct that plainly falls within the subject matter of the PSA") (citation omitted).[39]

Moreover, Plaintiff mischaracterizes the RMBS Trustee's duties by alleging that it was "required to execute certain documents associated with the Trusts when exercising its rights to foreclose on a property."   ¶ 159.  Not surprisingly, Plaintiff cites no authority for that allegation, which is inconsistent with the vastly different roles of the RMBS Trustee and the Servicers, as explained *supra* at II.B & II.C.

---

[39] *See also Metro. W.*, 2004 WL 1444868, at *8-9 (dismissing negligence claim because plaintiff did not allege an act or omission that was not based on contractual duties); *Clark-Fitzpatrick,* 516 N.E.2d at 193-94 (dismissing negligence claim because it does not allege violation of a legal duty independent of the contract); *see also AG Capital*, 896 N.E.2d at 68 (finding negligence claim must arise out a duty "separate and apart from [the trustee's] contractual duty"); *Millennium Partners,* 2013 WL 1655990, at *4 (same).

6.   No Cognizable "Injunctive Relief" Cause of Action Exists

"Injunction is not a separate cause of action; it is a remedy." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) (citations omitted); *see also Chruby v. Kowaleski*, No. 12-3132, 2013 WL 4010243, at *3 n.2 (3d Cir. Aug. 7, 2013) ("[A]n injunction is a remedy rather than a cause of action . . . ." (citing *Birdman v. Office of the Governor*, 677 F.3d 167, 172 (3d Cir. 2012)). Moreover, to obtain injunctive relief, plaintiffs "must allege that they will suffer irreparable harm because of the conduct, *e.g.*, that they have no adequate remedy at law, and that the balance of equities weighs in their favor." *Reuban H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995). Plaintiff repeatedly cites the impairment of its investments—*i.e.*, money damages—as its sole harm, and it therefore cannot obtain injunctive relief.

7.   Plaintiff Fails to State a Claim for Breach of Implied Covenant of Good Faith and Fair Dealing ("ICGFFD")

Plaintiff's claim for breach of the ICGFFD should be dismissed because it is duplicative of Plaintiff's breach of contract claim. *See Spread Enters., Inc. v. First Data Merchant Servs. Corp.*, No. 11-cv-4743 (ADS), 2012 WL 3679319, at *5 (E.D.N.Y. Aug. 22, 2012). A breach of the ICGFFD "cannot give rise to liability if it merely replicates the liability for breach of the underlying contract," which is what Plaintiff seeks to do here. *See Coca-Cola N. Am. v. Crawley Juice, Inc.*, No.

-39-

09-CV-3259(JG)(RML), 2011 WL 1882845, at \*9 (E.D.N.Y. May 17, 2011).

Plaintiff's inability to identify any implied promise consistent with the PSA that would impose non-duplicative, extra-contractual duties on the Trustee may result from the fact that the PSAs for the Trusts bar any claim that the Trustee assumed any implied contractual obligations. Under the PSAs, absent an ongoing EOD: (1) the Trustee must "perform such duties and only such duties as are specifically set forth in this Agreement"; (2) "the duties and obligations of the Trustee shall be determined solely by the express provisions in this Agreement;" and (3) "no implied covenants or obligations shall be read into this Agreement against the Trustee." CSMC PSA, § 9.01; MALT PSA, § 8.01. Through this carefully chosen language, the parties plainly intended to circumscribe the scope of the RMBS Trustee's responsibilities and preclude implied obligations.

## IV.    CONCLUSION

The Complaint fails for the reasons stated above and should be dismissed.

-40-

Dated:      New York, New York
              September 23, 2013

*Of Counsel:*

**MORGAN, LEWIS & BOCKIUS
LLP**

Michael S. Kraut (*pro hac vice*
admission pending)
101 Park Avenue
New York, New York 10178
(212) 309-6000

**MORGAN, LEWIS & BOCKIUS
LLP**

By: /s/ Lisa M. Campisi
    Lisa M. Campisi (LC1018)
    101 Park Avenue
    New York, New York 10178
    (212) 309-6000

*Attorneys for Defendant U.S. Bank
National Association*

-41-