MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000
*Attorneys for Defendant*
*U.S. Bank National Association*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VNB REALTY, INC., a wholly owned subsidiary of Valley National Bank, | Civil Action No. 13-cv-04743-WJM-MF |
| Plaintiff, | |
| vs. | DOCUMENT ELECTRONICALLY FILED |
| U.S. BANK, N.A., | |
| Defendant. | MOTION DATE: December 2, 2013 |

## DEFENDANT U.S. BANK NATIONAL ASSOCIATION'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS

**MORGAN, LEWIS & BOCKIUS LLP**
Lisa M. Campisi (LC1018)
Michael S. Kraut (admitted *pro hac vice*)
101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendant U.S. Bank*
*National Association*

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ....................................................................1

II.   ARGUMENT..........................................................................................2

      A.    The "No-Action" Clauses Bar Plaintiff's Claims ................................2

      B.    Plaintiff Has Failed To Articulate A Plausible Basis To Hold
            U.S. Bank Responsible For "Robo-Signing" .......................................4

            1.    Plaintiff's "Failure To Act Because Of A Conflict"
                  Theory Fails ....................................................................4

            2.    Plaintiff Failed To Allege That Robo-Signing Actually
                  Occurred in Connection With A Single Loan In The
                  Trusts.............................................................................7

            3.    Plaintiff Did Not Plead How It Was Harmed By Robo-
                  Signing ...........................................................................9

      C.    Plaintiff Fails To Plausibly Demonstrate That U.S. Bank
            Violated Any Duty Concerning R&Ws ...........................................12

            1.    Plaintiff Cannot Create A Duty To Investigate Possible
                  R&W Breaches Based On A Fictitious Duty To "Nose to
                  the Source".....................................................................12

            2.    Plaintiff's Allegations Of Generally-Available
                  Information Does Not Trigger Any Duty Of The Trustee.......15

            3.    Plaintiff  Cannot Save Its R&W Claims By Referring To
                  An Entirely Irrelevant Conflict Of Interest.............................17

            4.    Plaintiff Has Not Plausibly Alleged A "Default" Under
                  The TIA .........................................................................18

      D.    Plaintiff's Individual Claims Fail For All Of These Reasons............21

III.  CONCLUSION........................................................................................23

### TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>

*Akenthos Capital Mgmt., LLC v. Compucredit Holdings Corp.*,
  677 F.3d 1286 (11th Cir. 2012) .......................................................... 3

*Aldridge v. Brodman*,
  954 N.Y.S.2d 359 (N.Y. App. Div. 2012) ........................................ 10

*Beck v. Manufacturers Hanover Trust Co.*,
  218 A.D.2d 1 (N.Y. App. Div. 1995) ................................................. 5

*BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance
  Corp.*,
  673 F.3d 169 (2d Cir. 2012) ............................................................... 5

*BNYM v Walnut Place*,
  819 F. Supp. 2d 354 (S.D.N.Y. 2011) ................................................ 5

*Commerce Bank v. U.S. Bank Nat. Assn.*,
  No. 13-cv-517 (W.D. Mo. Nov. 18, 2013) ECF No. 53 ...................... 4, 6, 12, 21

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992) ............................................................... 3

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011) ............................................. 3, 4

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988) .............................................................. 5, 6

*Employees Retirement System of the Government of the Virgin Islands v.
  J.P. Morgan Chase & Co.*,
  804 F. Supp. 2d 141 (S.D.N.Y. 2011) .............................................. 16

*Federal Housing Finance Agency v. J.P. Morgan Chase & Co.*,
  902 F. Supp. 2d 476 (S.D.N.Y. 2012) ........................................... 16, 17

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007) .............................................................. 17

*Howe v. Bank of New York Mellon*,
  783 F. Supp. 2d 466 (S.D.N.Y. 2011) ............................................. 3, 5

**TABLE OF AUTHORITIES**

Page(s)

*In re American Roads LLC*,
     496 B.R. 727 (Bankr. S.D.N.Y. 2013) ................................................................. 3

*Magten Asset Management Corp. v. Bank of New York*,
     No. 600410/10, 2007 WL 1326795 (N.Y. Sup. May 8, 2007) .......................... 14

*MASTR Asset Backed Securities Trust 2006-HE3 by U.S. Bank Nat'l Ass'n v.
     WMC Mortgage Corp.*,
     2012 WL 4511065 (D. Minn. Oct. 1, 2012) ........................................ 13, 14, 17

*MASTR Asset Backed Securities Trust 2007-WMC1, ex rel. U.S. Bank Nat.
     Ass'n v. WMC Mortg. LLC*,
     880 F.Supp.2d 418 (S.D.N.Y. 2012) .................................................................. 18

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*,
     14 N.Y.3d 419 (N.Y. 2010) ............................................................................... 14

*SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*,
     2013 WL 1233544 (E.D.N.Y. Mar. 27, 2013) ..................................................... 4

*Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*,
     No. 09 C 6904, 2010 WL 3324705 (N.D. Ill. Aug. 20, 2010) ........................ 3, 4

*Teva Pharm. Indus. Ltd. v. SmithKline Beecham Corp.*,
     2009 WL 1687457 (D.N.J. June 16, 2009) ........................................................... 6

*Toone v. Wells Fargo Bank, N.A.*,
     2:11-cv-00170-TS, Dkt. No. 2-1 ....................................................................... 8, 9

*Trust for the Certificateholders of the Merrill Lynch Mortgage Pass-
     Through Certificates Series 1999-C1 v. Love Funding Corp.*,
     No. 04-cv-9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) ........................ 20

*U.S. Bank Nat. Ass'n v. Dexia Real Estate Capital Markets*,
     No. 12-cv-9412, 2013 WL 2468027 (S.D.N.Y. June 6, 2013) ........................... 18

*U.S. Bank Nat. Ass'n v. Greenpoint Mortgage Funding, Inc.*,
     939 N.Y.2d 395 (N.Y. App. Div. 2012) ............................................................. 18

**STATUTES**

15 U.S.C. § 77ooo(a) & (c) .................................................................................. 19

## TABLE OF AUTHORITIES

Page(s)

Fed. R. Civ. P. 12 ...................................................................................................6

## I.   **PRELIMINARY STATEMENT**[1]

Plaintiff's claims against the RMBS Trustee involve two unrelated theories of alleged wrongdoing by non-parties to this lawsuit: (1) "robo-signing" by the Master Servicer and Servicers, and (2) breaches of loan-level representations and warranties ("R&Ws") by Sellers.  Under common law and the governing agreements, the RMBS Trustee is not liable for overseeing or investigating the conduct of those deal parties, absent specific conditions not at issue here.

With respect to the first theory, Plaintiff concedes it "does not allege a breach of any express contractual duty to" prevent "robo-signing."  (Opp. at 18.) Plaintiff asserts instead that, because of an alleged conflict of interest, the Court should strike PSA provisions that state that the RMBS Trustee has no responsibility for Servicers' conduct and replace them with new provisions stating the exact opposite.  Such judicial rewriting is not warranted in light of the unambiguous terms of the PSAs, which reflect the parties' bargained-for rights and settled expectations and the law concerning the limited duties of an indenture trustee.  Plaintiff's claims also do not satisfy the *Iqbal/Twombly* plausibility test, as Plaintiff did not plead that:  (i) robo-signing occurred in the Trusts; (ii) the RMBS

---

[1]      Defined terms have the same meaning as in the Memorandum of Law by Defendant U.S. Bank National Association in Support of its Motion to Dismiss (the "Moving Brief" or "Moving Br.").  Plaintiff's Memorandum of Law in Response to Defendant's Motion to Dismiss is referred to as the "Opposition" or "Opp."

Trustee knew about robo-signing; (iii) the RMBS Trustee had a duty to prevent robo-signing; or (iv) Servicer robo-signing injured it in a non-speculative way.

Plaintiff also cannot sue the RMBS Trustee for failing to enforce R&W breaches unless the RMBS Trustee knew about them and failed to take contractually-mandated actions.  Unable to meet this burden, Plaintiff pretends that the RMBS Trustee was subject to a heightened standard of care.  However, that standard only applies following specified events that did not occur.  Plaintiff also now argues that the alleged "robo-signing" conflict supports its R&W theory, but a Servicer "robo-signing" conflict has nothing to do with Seller R&W breaches.

For these reasons, this case should be dismissed.

## II.   <u>ARGUMENT</u>

### A.   The "No-Action" Clauses Bar Plaintiff's Claims

"No-action" clauses in the PSAs require investors to make demand on a notice party (the "Notice Party") before they can sue the RMBS Trustee.  Plaintiff concedes that it did not comply with the demand requirement but now argues that the Court should ignore its failure to do so.

Plaintiff first argues that the no-action clauses only apply to suits against the Master Servicer or Servicer relating to an EOD.  (Opp. at 5-6.)  However, the no-action clauses for these Trusts plainly apply to "any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement . . . , and no-

action clauses are "strictly construe[d]."[2]  One court recently enforced a no-action

clause containing *identical* language to the clauses at issue here in analogous

circumstances.[3]   The court rejected the certificateholder's argument that "the

clause can be read to apply only to claims against [the servicer] (or to claims

specifically seeking damages caused by Events of Default)" because the contract

language barred "any suit."  *Sterling I*, at *4.[4]

Plaintiff argues that its noncompliance with the demand requirement should

be excused because the only Notice Party other than U.S. Bank is Wells Fargo

Bank, N.A., which Plaintiff accuses of robo-signing.  (Opp. at 6-7.)  *Sterling I*

explicitly rejects this argument.  2010 WL 3324705 at *4.  As here, the *Sterling I*

plaintiffs argued that it would have been futile to ask the Notice Party to sue

because the plaintiffs also alleged wrongdoing by the Notice Party.  The court

---

[2]    CSMC PSA, § 12.07; MALT PSA, § 11.08; *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992); s*ee also In re American Roads LLC*, 496 B.R. 727, 731 (Bankr. S.D.N.Y. 2013) (per "no action" clause, investors waived individual rights and actions in favor of collective action by the enforcing parties).

[3]    *Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.,* No. 09 C 6904, 2010 WL 3324705, at *3-4 (N.D. Ill. Aug. 20, 2010) (New York law) ("*Sterling I*").

[4]    Plaintiff's argument, based on *Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 473 (S.D.N.Y. 2011) that a reference to an EOD in an exception to the no-action clause saves its claims has been rejected by multiple courts.  *See, e.g., Akenthos Capital Mgmt., LLC v. Compucredit Holdings Corp.*, 677 F.3d 1286, 1293 n.7 (11th Cir. 2012) (rejecting argument that "because the trustee demand exception contemplates an [EOD], the entire no-action clause only applies to claims predicated on a Default.  We do not agree that the scope of an exception to a rule should necessarily define the scope of the rule itself."); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 184 (S.D.N.Y. 2011) (no-action clause is not limited to claims arising out of EOD).

-3-

disagreed, explaining: "there is an important difference between asking the [Notice Party] to sue itself – an 'absurd' requirement . . . and asking it to sue a third party, *even when the investor alleges wrongdoing by the [Notice Party]*." 2010 WL 3324705, at *5 (emphasis added).[5]

**B. Plaintiff Has Failed To Articulate A Plausible Basis To Hold U.S. Bank Responsible For "Robo-Signing"**

       1. Plaintiff's "Failure To Act Because Of A Conflict" Theory Fails

Plaintiff's servicing-breach theory is predicated on U.S. Bank's "conflict of interest." (Opp. at 1.) However, the Complaint alleges only a hypothetical conflict predicated on U.S. Bank's alleged unrelated conduct as a servicer for unrelated loans, and hypothetical conflicts are not actionable. (Moving Br. at 25-27.) Plaintiff's theory also fails for the reasons explained below.

---

[5]     Other courts agree. *See SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.,* 2013 WL 1233544, at *12 (E.D.N.Y. Mar. 27, 2013); *Ellington,* 837 F. Supp. 2d at 186. Cases that Plaintiff cites for the proposition that compliance with a no-action clause is excused if the trustee has an alleged conflict are inapposite (Opp. at 7) because in those cases the Trustee was the only party upon whom demand could have been made. *But see* Order at 5-6, *Commerce Bank v. U.S. Bank Nat. Assn.,* No. 13-cv-517 (W.D. Mo. Nov. 18, 2013), ECF No. 53 ("*Commerce*") (a copy of the *Commerce* order is filed at ECF No. 21-1). In *Commerce,* the court declined to apply a no-action clause where the trustee allegedly "knew or should have known of the servicers' misconduct and failed to report the misconduct to certificateholders," rendering application of the clause "absurd[]". *Id.* The *Commerce* court did not explain how reporting of purported servicer misconduct to certificateholders distinguished that case from *Sterling I,* and none of the parties in that case or this case argued that a failure to report servicer misconduct to certificateholders renders the no-action clauses absurd.

a.   Plaintiff's Cases Do Not Support Its Conflict Theory

No case cited by Plaintiff stands for the proposition that the duty to avoid

conflicts imparts upon the RMBS Trustee a substantive duty to supervise or

investigate servicers, which the PSAs expressly state the Trustee need not do

absent direction from certificateholders.[6]  Plaintiff relies on *Dabney*, but, as the

court in *Dabney* recognized, the duty to avoid conflicts means that the trustee may

not allow a conflict of interest to influence *how it performs its delineated job*

*functions*:  the "trustee may confine his duties.  That question is necessarily

determined by the trust deed; but it has nothing to do with the trustee's duty to

discharge **whatever obligations he does assume** with absolute singleness of

purpose."  *Dabney*, 196 F.2d at 671 (emphasis added).[7]  *Dabney* did not impose on

---

[6]      Plaintiff cites *BNYM v Walnut Place*, 819 F. Supp. 2d 354, 364 (S.D.N.Y. 2011), but that decision was vacated on appeal.  *See BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp.*, 673 F.3d 169, 179-80 (2d Cir. 2012).  Plaintiff also cites *Howe*, 783 F. Supp. 2d at 483, for the proposition that a trustee must avoid conflicts.  *Howe* focused entirely on the trustee's performance of its *express* contractual duties.  *Howe* in no way suggests that, in avoiding conflicts, the trustee takes on affirmative obligations to engage in tasks—such as investigating or monitoring a servicer—that the indenture expressly states that the trustee need not perform.  In *Beck*, the court only found that the trustee had a duty of undivided loyalty after an EOD occurred, which did not occur here.  *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 12-13 (N.Y. App. Div. 1995).

[7]      *See also Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 70-71 (2d Cir. 1988) (trustee does not have an implied duty to act "over and above the duties and obligations it undertook in the indenture").

trustees extra job responsibilities as part of its duty to avoid conflicts and did not impose on indenture trustees implied fiduciary duties not found in the indenture.[8]

In *Commerce*, the District Court deferred a decision regarding whether such fiduciary duties exist to the summary judgment stage. *Commerce* at 8. However, neither party to this case has suggested that the PSAs are ambiguous. As such, whether the RMBS Trustee had a duty is a question of law that is properly decided by the Court on a Rule 12 motion. *See, e.g., Teva Pharm. Indus. Ltd. v. SmithKline Beecham Corp.*, 2009 WL 1687457, at *3-4 (D.N.J. June 16, 2009) (dismissing breach claim based on reading of unambiguous contract as a matter of law).

> b.   Plaintiff Fails To Plausibly Allege What
>      U.S. Bank Should Have Done That It Failed To Do

Plaintiff alleges that, because of a conflict, Defendant failed "to prevent, remedy, or address the robo-signing within the Trusts at issue." (¶ 88.) Plaintiff makes three statements that undermine its claims:

---

[8]   "*Dabney* . . . does not support the broader proposition that an implied fiduciary duty is imposed on a trustee to advance the financial interests of the debenture holders during the period prior to default." *Elliott,* 838 F.2d at 70-73 (prior to an EOD, the trustee has no implied fiduciary duties under New York law or the TIA); (Moving Br. at 25-27.)

*Dabney* also is factually inapposite. In *Dabney*, the trustee was a creditor of the debtor. 196 F.2d at 669. Concern about the debtor's solvency led the trustee to collect on a loan that the debtor owed the trustee personally rather than use those funds to repay the bondholders. *Id.* at 669, 671. The court recognized that a trustee may not profit at the expense of the trust and that the trustee breached that duty by stepping in front of the beneficiaries. *Id.* at 672-73. Those facts differ greatly from what Plaintiff alleges here. (Moving Br. at 19-20.)

- The Trustee had no duty to *sua sponte* investigate to see if servicers might be robo-signing.  (Opp. at 14.)
- Massive government investigations into servicer robo-signing led to government consent orders in April 2011.  These public orders reflect that "robo-signing" had been identified and addressed by regulators.  (*Id.* at 11.)
- U.S. Bank should be imputed with knowledge of robo-signing as of October 2011, months after consent orders were announced.  (*Id.* at 14; ¶ 123.)

Given its acknowledgement that U.S. Bank had no duty to investigate, Plaintiff appears to argue that U.S. Bank should have acted in October 2011 *after* regulators stepped in and addressed the issue.  Plaintiff does not specify what action U.S. Bank was required, but failed, to take.  Plaintiff's conclusory response is that "Defendant breached its duty to avoid conflicts of interest, and, because of this egregious conflict, took no discretionary action, not even alerting Plaintiff . . . ." (Opp. at 14.)  Plaintiff—a bank that services mortgages and is subject to the same foreclosure requirements—cannot credibly suggest that it was prejudiced because the RMBS Trustee did not alert it to publicly disclosed consent orders.

2.    Plaintiff Failed To Allege That Robo-Signing Actually
      <u>Occurred In Connection With A Single Loan In The Trusts</u>

In the Moving Brief, U.S. Bank established that:  (i) the loans in the Trusts were serviced by more than a dozen different financial institutions; (ii) Plaintiff's Complaint focuses solely on alleged robo-signing by one of those institutions— Wells Fargo; (iii) Plaintiff did not plead a single ***actual*** instance of robo-signing with respect to any loans in the Trusts; (iv) the Complaint does not allege that U.S.

Bank was aware that any document was robo-signed; and (v) Plaintiff failed to allege how robo-signing led to a loss to the Trust investors.  Plaintiff ignores and thereby concedes these points.  The only remaining question is whether the conclusory statement that Wells Fargo filed flawed (and unidentified) documents "with regard to the Trusts" is sufficient to plausibly allege that robo-signing occurred *with respect to loans in the Trusts*.  (Opp. at 11.)

U.S. Bank catalogued numerous opinions in which courts held that general allegations that a bank robo-signed are not sufficient to satisfy the pleading standards of *Iqbal* and *Twombly*; rather robo-signing allegations must be specifically and plausibly tied to the loan or trust(s) at issue.  (Moving Br. at 18.) Plaintiff offers no contrary authority, incorrectly contending that these cases are distinguishable because "Plaintiff's allegations are more detailed and far less generalized than those in" the cases cited by U.S. Bank.  (Opp. at 13.)

Plaintiff focuses only on *Butler* and *Toone*.  In *Butler*, as here, the plaintiffs tried to satisfy their pleading requirements by citing to news reports.[9]  In *Toone*, the plaintiffs went further and alleged that certain documents in connection with

---

[9]    *Butler v. Wells Fargo Bank, N.A.*, 1:12–cv–2705–MJG, Dkt. No. 2, Complaint at ¶ 17 (D. Md. Sept. 10, 2012) ("As would later be revealed by various news media, during this time, many mortgage servicers and substitute trustees were filing affidavits and papers in foreclosure actions, where (a) the named affiants or signatories did not sign the documents or (b) the named affiants or signatories did not review or confirm the accuracy of the information asserted in the documents prior to signing them.").

their action were robo-signed.[10]  The courts in both cases—and many others cited

by U.S. Bank that Plaintiff does not address—held that generic allegations are not

enough.  This Court should reach the same conclusion.

> 3.   Plaintiff Did Not Plead How It Was Harmed By Robo-Signing

In the Opposition, Plaintiff focuses on four types of damages that it allegedly

suffered.  (Opp. at 16.)  But Plaintiff does not tie any of these damages theories to

its theory that, beginning in October 2011, U.S. Bank failed to address robo-

signing.  Contrary to Plaintiff's argument, U.S. Bank is not suggesting that

Plaintiff is subject to a heightened pleading standard or must prove damages at this

stage.  Rather, Plaintiff's four damages theories, summarized below, are not

connected to their liability theory and therefore are not plausible.

*Theory 1:  Wells Fargo improperly passed foreclosure fees onto investors.*

Plaintiff does not explain what these fees are or how they are tied to some

alleged breach by U.S. Bank of a phantom duty to "alert Plaintiff" of publicly-

disclosed allegations of robo-signing.  Rather, Plaintiff seeks to foist upon U.S.

Bank a duty to monitor fees that Servicers charge, which does not appear in the

PSAs or otherwise exist.  Moreover, the "conflict" Plaintiff has identified in the

Complaint concerns robo-signing only, not improper foreclosure fees.

---

10      "There next appears an endorsement from Accubanc to Norwest Mortgage.
It is not dated.  Upon information and belief, the signature of 'Jan B. Hatmick' was
a 'robo-signed' or 'robo perjured' signature." *Toone v. Wells Fargo Bank, N.A.*,
2:11-cv-00170-TS, Dkt. No. 2-1, Complaint at ¶¶ 30 (D. Utah Feb. 14, 2011).

> _Theory 2:  Foreclosures have become more expensive as a result of the "costs associated with preparing foreclosure documentation" and new "enhanced foreclosure processes" designed to prevent robo-signing._

This theory makes no sense.  (Moving Br. at 23-25.)  Plaintiff blames U.S. Bank for not stopping robo-signing and in the same breath argues that U.S. Bank should pay _damages_ for increased costs that ensued when robo-signing ceased. Plaintiff cannot have it both ways.  Moreover, the Complaint does not allege that U.S. Bank had any role in implementing the "enhanced foreclosure processes." Under no plausible theory could U.S. Bank be financially responsible for costs of enhanced procedures now used by Servicers to prevent robo-signing.[11]

> _Theory 3:  A "logjam" in foreclosures led to increased expense._

Whether this "logjam" refers to court delays or perceived slow processing of foreclosures by servicers, Plaintiff does not allege that U.S. Bank controls foreclosure speed, or how its alleged failure to act in October 2011, when it was "imputed" with knowledge of robo-signing, affected foreclosure speed or cost.

> _Theory 4:  Defendant's actions caused "unwarranted losses" to the Trusts._

---

[11]    Plaintiff suggests it would have been harmed if "Wells Fargo had been allowed to continue engaging" in robo-signing.  (Opp. at 16.)  To the extent Plaintiff seeks to support its claim with a speculative theory of how it may have been harmed, it fails.  _See Aldridge v. Brodman_, 954 N.Y.S.2d 359, 362 (N.Y. App. Div. 2012) (claims based on "wholly speculative theories of damages" are subject to dismissal (quotations omitted)).  Moreover, Plaintiff does not allege what that harm would be, since the only harm remotely alleged in the Complaint resulted from legal and regulatory burdens imposed by governmental bodies.

Plaintiff does not explain how the Trusts lost value, or how U.S. Bank's alleged failure to take action in October 2011 affected the Trusts' value.

Moreover, Plaintiff concedes that a clause in the CSMC PSA limits U.S. Bank's liability, rendering it not responsible for "special, indirect or consequential [damages]."  (Opp. at 16-17.)  Plaintiff argues that the clause does not apply because "Defendant directly harmed Plaintiff by allowing the Trusts to incur costs and sustain losses caused because Defendant knowingly allowed the servicer and sub-servicers to forge documents and breach recording statutes, making it difficult or impossible to prove ownership of the underlying mortgages and unnecessarily draining Trust corpuses."  (Opp. at 17.)  Some of the flaws in that sentence are:

- "*allowing* Trusts to incur costs and sustain losses" is necessarily indirect;
- a statement that the RMBS Trustee "knowingly allowed" forgery is not pled in the Complaint and implies a supervisory role over loan servicing that is not supported by the PSAs; and
- the Complaint does not address recording statutes, and under the PSAs, RMBS Trustees are not responsible for recording mortgage loan documents.

Apart from the flaws in that sentence, the theory itself does not make sense.  The "damages" that Plaintiff seeks, such as increased Trust expenses resulting from decisions by states to enhance their foreclosure requirements, could not have been *directly* caused by the RMBS Trustee's actions, and as a result, claims arising from Servicer "robo-signing" should be dismissed.

**C.      Plaintiff Fails To Plausibly Demonstrate That U.S. Bank Violated Any Duty Concerning R&Ws**[12]

Plaintiff's second theory is that U.S. Bank is responsible for Sellers'

breaches of R&Ws.  However:  (i) Plaintiff does not dispute that U.S. Bank is not

charged with enforcing Sellers' breaches with respect to the CSMC 2006-8 Trust,

(Moving Br. at 31); (ii) Plaintiff did not allege facts supporting a theory that U.S.

Bank had knowledge of Sellers' breaches with respect to MALT 2007-1, and (iii)

U.S. Bank is not required to investigate "possible" breaches.

1.      Plaintiff Cannot Create A Duty To Investigate Possible R&W
        Breaches Based On A Fictitious Duty To "Nose to the Source"

U.S. Bank argued that Plaintiff failed to allege any facts showing that U.S.

Bank had notice of R&W breaches.  (Moving Br. at 28-31.)  In response, Plaintiff

provides several citations to the Complaint, none of which remotely suggests that

that the RMBS Trustee had notice.  (Opp. at 24 (citing ¶¶ 32, 37, 56-61).)[13]

---

[12]      The complaint in *Commerce* does assert any claims concerning R&Ws.  The *Commerce* decision is therefore irrelevant to the analysis of this separate theory.

[13]      Paragraph 32 alleges no facts at all, simply stating the conclusion that U.S. Bank was on notice.  Paragraph 37 alleges that U.S. Bank accepted and held documents and mortgage loans but says nothing about notice of breaches.  Paragraphs 56-61 describe a review conducted by Allstate concerning CSMC 2006-8 (a Trust for which U.S. Bank is *not* charged with enforcing Sellers' breaches), but these allegations do not allege how or when U.S. Bank purportedly received notice of this review and do not address MALT 2007-1.  As U.S. Bank noted in the Moving Brief, Allstate had invested in a different loan group than Plaintiff, such that Allstate's review had no relevance to loans collateralizing Plaintiff's certificates.  (Moving Br. at 31, n.32.)  Plaintiff ignores this argument.

Unable to establish that U.S. Bank was on notice on of any R&W

breaches,[14] Plaintiff pivots and relies on a single Minnesota case for the

proposition that an indenture trustee is on notice of a breach when it has received

"facts merely suggestive of a breach," after which the trustee is required to "pick

up the scent" of the possible breach and "nose to the source."  (Opp. at 23 (quoting

*MASTR Asset Backed Securities Trust 2006-HE3 by U.S. Bank Nat'l Ass'n v. WMC*

*Mortgage Corp.*, 2012 WL 4511065 (D. Minn. Oct. 1, 2012).)  The *MASTR*

decision does not discuss, and there is no indication that the parties asserted in their

briefs, a no-investigation clause like that contained in the PSAs at issue here,

which is critical.  "Nos[ing] to the source" is another way of saying that U.S. Bank

was required to investigate, which plainly is not required of U.S. Bank with respect

to the Trusts pursuant to Section 9.02(v) of the CMSC PSA and Section 8.02(iv) of

the MALT PSA.  Notably, Plaintiff argues that "nosing to the source" is an

"independent duty" of U.S. Bank, but fails to direct the Court to any provision in

the PSAs from which such an "independent duty" arises, and the PSAs contain no

implied trustee duties.  (Moving Br. at 40.)  Plaintiff's failure to connect this

"independent duty" to any express duty in the PSAs is fatal.  To the extent Plaintiff

---

[14]     Plaintiff's assertion that U.S. Bank is "estopped" from relying on notice as a
pre-condition to enforcing is unsupportable.  Plaintiff alleges that U.S. Bank
"caused" the non-occurrence of notice of R&W breaches, but fails to explain how.
U.S. Bank had no duty to investigate to find such breaches, and therefore was not
responsible for the "non-occurrence" of an investigation into Seller conduct.

argues that *MASTR* can be read broadly, New York courts disagree with it.  *See,*

*e.g., Magten Asset Management Corp. v. Bank of New York*, No. 600410/10, 2007

WL 1326795, at *7 (N.Y. Sup. May 8, 2007) (courts "have consistently rejected

the imposition of additional duties on the trustee" beyond those in the trust

agreement).  In *Magten*, the Court explained that:

> [w]hether BNY had a duty to investigate NorthWestern's financial
> condition is governed by the standards applied to an indenture
> trustee's pre-default duty.  Neither the law regarding an indenture
> trustee's duties, nor the Indenture, supports Magten's contention that
> BNY was duty bound to examine NorthWestern's financial condition
> in order to decide whether NorthWestern had made the admission or
> was actually able to pay its debts.

2007 WL 1326795, at *7.

The notice standard and "no duty to investigate" provision in the PSAs are

essential to the functioning of these and countless similar transactions.  (Moving

Br. at 21-23.)  Without them, the RMBS Trustee could be sued every time a deal

went wrong on the theory that it "should have known about" or "should have

investigated" whatever alleged wrongdoing led to the losses.  Under governing

law, corporate trustees need not—and should not—investigate every theoretical

lead.[15]  No entity would serve as a corporate trustee without these protections.[16]

---

[15]     *See Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*, 14 N.Y.3d
419, 425 (N.Y. 2010) (rejecting claim that indenture trustee needed to confirm
accuracy of SEC filings submitted to it as "greatly expanding indenture trustees'
recognized administrative duties far beyond anything found in the contract").

Plaintiff has failed to support its alternative vision of an interventionist trustee that must launch costly investigations and lawsuits without investors' direction or even approval.  Plaintiff ignores numerous cases cited by U.S. Bank that highlight the narrow, ministerial duties of indenture trustees, and the contractual language here confirming those limited duties.  Plaintiff rests solely on a single Minnesota case discussing a different transaction applying duties at odds with New York law and the contracts at issue here.

        2.      Plaintiff's Allegations Of Generally-Available Information
                  Does Not Trigger Any Duty Of The Trustee

Plaintiff claims that it has sufficiently alleged that U.S. Bank was on notice of R&W breaches even though it concedes it has not alleged U.S. Bank was on notice of a single breaching loan in which they were invested.[17]  Rather, Plaintiff seeks to rely on its assertion that U.S. Bank was aware of "widespread abandonment of underwriting guidelines."  (Opp. at 22.)  But different parties

---

[16]     "[E]fforts to subject it . . . to the same degree of care with respect to the security as is required of an ordinary trustee . . . would make the position of an indentured trustee untenable and render financing of this type almost impossible . . . ."  R. Landau & R. Pelluso, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 40 (6th ed. 2008).

[17]     Plaintiff alternatively argues vaguely that U.S. Bank's possession of certain "mortgage files" put it on notice of breaches (Opp. at 21), but Plaintiff does not identify to which files it is referring.  In any event, Plaintiff does not allege that U.S. Bank had *any* duty to review *any* "mortgage files" for evidence of R&W breach, again because no such duty exists.

assumed different duties under the PSA, and U.S. Bank did not assume any duty to enforce R&W breaches under the CSMC 2006-8 Trust.  (Moving Br. at 31.)

As for the MALT 2007-1 Trust, Plaintiff did not identify any notice to the RMBS Trustee of breaches, and the RMBS Trustee has no duty to investigate; accordingly, Plaintiff has not alleged facts supporting a conclusion that the RMBS Trustee breached a duty to enforce.  This makes sense, as enforcement of a Seller's repurchase obligation is necessarily a loan-by-loan inquiry, as both the enforcing party and the Seller must know which loans should be repurchased.  *See* MALT PSA, § 2.03 (breaching loan seller to "purchase such Mortgage Loan" or "substitute for the related Mortgage Loan").  General public reports alleging "abandonment of guidelines" that are not specific to the Trusts—let alone specific loans in the Trusts—do not provide sufficient information to enable enforcement to occur.  Plaintiff's acknowledgement that the RMBS Trustee has no duty to investigate, (Opp. at 14), is the death knell to Plaintiff's theory.[18]

---

[18]     To the extent that Plaintiff alleges that the RMBS Trustee had a duty to provide notice of generalized, public reports, that makes no sense because those reports already are known to all parties.
        Plaintiff relies on *Employees Retirement System of the Government of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011) and *Federal Housing Finance Agency v. J.P. Morgan Chase & Co.*, 902 F. Supp. 2d 476, 490 (S.D.N.Y. 2012) for the proposition that it need not allege that "any particular loan or loans" were in breach.  Neither case has any relevance to this case.  *Virgin Islands* and *FHFA* are securities fraud cases asserted against an underwriter; the issue in those cases was not whether the plaintiffs had identified a breach of contract, but rather whether they had pled a misstatement.  *Virgin*

3.     Plaintiff  Cannot Save Its R&W Claims By Referring To An
       Entirely Irrelevant Conflict Of Interest

Unable to establish that the RMBS Trustee violated a duty to enforce

breaches, Plaintiff now argues that the alleged robo-signing conflict prevented U.S.

Bank from enforcing breach of R&W claims against Sellers, (Opp. at 25),

notwithstanding that this allegation did not appear in the Complaint and therefore

cannot be considered on this motion.[19]  However, typing the phrase "conflict of

interest" without more is not a free pass to fish in discovery.  The purported

conflict concerning robo-signing in the foreclosure process has no relation to

breaches of R&Ws by Sellers.  To the extent that Plaintiff implies that a conflict

prevented U.S. Bank from suing to enforce breaches of R&Ws, the Court can take

notice that U.S. Bank has repeatedly used to enforce R&W breaches, including in

the Minnesota case on which Plaintiff relies, which was filed by U.S. Bank, as

trustee for an RMBS Trust.  *See MASTR*, 2012 WL 4511065, at *1 ("In this action

plaintiff MASTR Asset Backed Securities Trust 2006–HE3, by U.S. Bank National

*Islands*, 804 F. Supp. 2d at 152; *FHFA*, 902 F. Supp. 2d at 484.  Moreover, the
complaint in *FHFA* "devoted over 60 of its 321 pages to . . . factual support" for its
misrepresentation claim, including "a sample of specific loans" as to which the
originator's statements of compliance with applicable underwriting standards were
misrepresentations.  *FHFA*, 902 F. Supp. 2d at 487.

[19]     *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("It is
axiomatic that the complaint may not be amended by the briefs in opposition to a
motion to dismiss." (quotations omitted)).  Plaintiff claims to have alleged that
"during the same time period, both U.S. Bank and Wells Fargo themselves were
recklessly originating large volumes of [loans] in violation of their own [R&Ws]."
(Opp. at 21.)  That allegation does not appear anywhere in the Complaint.

Association . . . seeks to compel defendant WMC Mortgage Corporation . . . to repurchase allegedly defective 'Mortgage Loans,' pursuant to a provision of the governing contract between the parties.").[20]

> 4.  Plaintiff Has Not Plausibly Alleged A "Default" Under The TIA

Plaintiff's final attempt at circumventing the PSAs relies on heightened duties of the TIA that allegedly attach after a "default."  (Opp. at 25-28.)

The TIA defines "default" to mean how "such term is defined in" the relevant indenture.  Both the CSMC PSA and the MALT PSA contain entire articles entitled "Default" that describe what the term means the various occurrences constituting Events of Default.  *See* CSMC PSA, Art. VIII ("Default") & MALT PSA, Art. VII ("Default").  This is consistent with industry practice: "[m]ost lawyers define 'default as an 'Event of Default' and the Securities and Exchange Commission has qualified under the TIA without objection all

---

[20]    *See also U.S. Bank Nat. Ass'n v. Dexia Real Estate Capital Markets*, No. 12-cv-9412, 2013 WL 2468027 (S.D.N.Y. June 6, 2013) (denying loan originator's motion to dismiss breach of contract action brought by U.S. Bank); *MASTR Asset Backed Securities Trust 2007-WMC1, ex rel. U.S. Bank Nat. Ass'n v. WMC Mortg. LLC*, 880 F.Supp.2d 418 (S.D.N.Y. 2012) ("The Trustee alleges that WMC breached [R&Ws] it made when it sold the loans to UBS, and seeks to compel WMC to repurchase the loans."); *U.S. Bank Nat. Ass'n v. Greenpoint Mortgage Funding, Inc.*, 939 N.Y.2d 395, 397 (N.Y. App. Div. 2012) ("U.S. Bank, by summons and complaint dated February 5, 2009, brought this action against GreenPoint for what it alleged were 'gross violations' of the ]R&Ws] regarding the attributes of the loans and the policies and practices under which the loans were originated, underwritten and serviced.").

indentures containing this definition of 'default.'"  Am. Bar Found., Commentaries on Model Debenture Indenture Provisions 249 (1986).

In response, Plaintiff argues that "default" should mean any "default on any mortgage loan in the Trust," (Opp. at 27), which is not supported by the governing agreements or any other authority and is illogical.  The lower case "d" word "default" appears in the PSAs in connection with mortgage payments by borrowers, but those references have nothing to do with the RMBS Trustee's duties or standard of care.[21]  On the other hand, construing "default" in a way that is consistent with the structure of the agreement and its customary meaning does. The "Default" article of the PSA addresses failures by the master servicer that place at risk the certificateholders' receipt of payments owed.  This risk often requires prompt action to protect the interests of the Trusts' certificateholders; accordingly, following an "Event of Default," the RMBS Trustee shifts from being purely a contract administrator to a party charged with acting as a prudent person would in managing his or her own affairs.  In contrast, Plaintiff's unsupported interpretation makes no sense by suggesting that the RMBS Trustee must assume heightened prudent person duties the first time that any of thousands of borrowers whose loans are held in an RMBS trust falls 30 days behind on his or her monthly

---

[21]     Moreover, the TIA does not permit "default" to be defined as it is used generically throughout an indenture; it refers to how the term is "defined."  15 U.S.C. § 77ooo(a) & (c) (emphasis added).

mortgage payments.  Under Plaintiff's interpretation, all RMBS trustees would be charged with heightened duties throughout the entire life of the trust, which is illogical and not what the parties could have intended. [22]

Importantly, even pretending that "default" under the PSAs could mean *any* instance in which the undefined term is used in those agreements, it would not trigger the TIA duties for R&W breaches because "default" is *never once* in the PSAs to describe a Seller's breach of a R&W.

Plaintiff argues that it sufficiently alleged that U.S. Bank was on notice of a default, but the allegations upon which Plaintiff relies are conclusory assertions that U.S. Bank was on notice of "likely breaches of [R&Ws]," ¶¶ 3, 32—*i.e.*, breaches that even under Plaintiff's absurdly broad reading are not swept into the definition of "default" under the TIA.[23]

---

[22]    Plaintiff's reliance on *Trust for the Certificateholders of the Merrill Lynch Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04-cv-9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) is unavailing.  *Love Funding* did not involve the TIA at all, much less find that the contractually defined meaning of "default" should be ignored.  Nor does *Love Funding* find that "default" can never be defined to mean an EOD, as it is in the PSAs at issue here; it simply found that was not true in the particular contract before it.  2005 WL 2582177, at *6.

[23]    U.S. Bank has no duty to enforce "likely" breaches or any duty to investigate, so "actual knowledge of *likely* breaches," (Opp. at 27), cannot support a breach claim.

Plaintiff raises a cursory assertion that it has "allege[d] the occurrence of an [EOD]."  (Opp. at 25 (citing ¶ 47)).  The allegation in the Complaint upon which Plaintiff relies does not support this assertion.  Paragraph 47 alleges that "When the Master Servicer fails to perform various duties . . . it triggers an [EOD] or

### D.    Plaintiff's Individual Claims Fail For All Of These Reasons

Each claim fails for reasons set forth in the Moving Brief and herein.

Count III, premised on a purported breach of a fiduciary duty, must be dismissed.  An RMBS trustee has no pre-default fiduciary duties.  (Moving Br. at 36-37.)  Plaintiff does not respond to this and therefore concedes the argument.

Count IV alleges a breach of contract.  The only contractual provision that Plaintiff identifies is that U.S. Bank had and breached a duty to "hold [] loans for the benefit of [] Certificateholders."  (Opp. at 30.)  Plaintiff alleged without explanation or basis that U.S. Bank held the loans for an unidentified Wells Fargo affiliate.  Plaintiff now suggests that U.S. Bank's merely "hold[ing]" of legal title to the mortgage loans creates a nearly limitless duty to police Servicer and Seller misconduct.  (Opp. at 30.)  This provision of the PSAs does not create any such duty, as that interpretation contradicts the RMBS Trustee's narrow duties as expressly set forth in the PSAs and New York law.  *See Commerce* at 9 (dismissing with prejudice similar breach of contract claim on basis that plaintiffs failed to identify a contract provision that was breached).

For Count V, Plaintiff asserts that an RMBS trustee can be liable for negligence for failure to perform "basic, non-discretionary ministerial tasks." (Opp. at 31-32) (quotation omitted).  Plaintiff then claims that U.S. Bank is liable

---

Termination," but does not allege what those "various duties are" or that the Master Servicer actually *did* fail to perform them.

because it should have signed foreclosure documents itself but instead allowed Wells Fargo or other servicers to do so.  (*Id.*)  This theory is refuted by the treatise authored by Plaintiff's counsel, which explains that the servicer, not the RMBS trustee, is responsible for conducting foreclosures.[24]  Plaintiff mistakenly asserts without basis that signing foreclosure documents is one of the RMBS Trustee's "basic non-discretionary ministerial tasks."  In fact, the PSAs make clear that servicing of mortgage loans is *not* a duty of the RMBS Trustee but rather a duty of the Servicer, and therefore the RMBS Trustee did not "allow" Wells Fargo to sign foreclosure documents.

Plaintiff concedes that Could VI for injunctive relief is not a stand-alone claim.  (Opp. at 32.)  Moreover, Plaintiff does not respond to, and therefore concedes, U.S. Bank's argument that Plaintiff failed to allege irreparable harm and thus cannot obtain injunctive relief.  (Moving Br. at 39.)  Plaintiff's request for injunctive relief and the standalone claim should be dismissed.[25]

---

[24]    Talcott J. Franklin and Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook, § 5:106 ("[S]ervicers are responsible for enforcing the terms of a defaulted securitized loan.  This responsibility may include . . . foreclosing on the property. . . .").

[25]    Count VII fails because Plaintiff concedes that it cannot assert an ICGFFD claim that is duplicative of a breach of contract claim, and then repeats the same breach underlying its contract claim, namely a failure to "hold [] loans." (Opp. at 33-34).  Plaintiff argues the two claims are different because it has also alleged an extra-contractual duty to avoid conflicts of interest, but that argument is unavailing for the reasons set forth above, namely that a conflict of interest does not give rise to additional substantive duties.

III.   **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint.

Dated:      New York, New York
            November 25, 2013

                        **MORGAN, LEWIS & BOCKIUS LLP**

                        By: /s/ Lisa M. Campisi
                            Lisa M. Campisi (LC1018)
                            Michael S. Kraut (admitted *pro hac vice*)
                            101 Park Avenue
                            New York, New York 10178
                            (212) 309-6000

                        *Attorneys for Defendant U.S. Bank National*
                        *Association*

-23-